MARY L. DYE, Respondent, v. NEW YORK LIFE INSURANCE CO., Appellant.

Springfield Court of Appeals, February 14, 1921.

1. **INSURANCE:** Burden on Life Insurer to Establish Defense of Misrepresentation. The burden was on defendant life insurer to establish its defense of misrepresentation of matters which contributed to the death of insured.

2. **TRIAL:** On Demurrer to Evidence, Plaintiff Entitled to Benefit of Every Reasonable Inference. Plaintiff, on demurrer to her evidence, is entitled to the benefit of every reasonable inference deducible from the evidence, and such reasonable inferences ought to be taken as conceded facts, and those favorable to defendant are to be ignored.

3. **INSURANCE:** Issues Raised on Life Insurer's Demurrer to Beneficiary's Evidence Properly Submitted to Jury. In an action on a life policy, defendant insurer setting up misrepresentations of insured that he had never raised or spat blood, issues raised by defendant insurer's demurrer to plaintiff's evidence *held* properly submitted to the jury, in view of the evidence.

4. **APPEAL AND ERROR:** Finding on Substantial Evidence not Disturbed. It is not the province of an appellate court to pass on the weight of the evidence, such duty being on the triers of the facts; and, where there is substantial evidence to support verdict, the finding will not be disturbed.

5. **INSURANCE:** Failure to Tender Back Premiums not Evidence of Waiver of Defense of Misrepresentation. In view of Revised Statutes 1919, section 6145, defendant life insurer's failure to tender back premiums, *held* not evidence of waiver of the defense of misrepresentation in obtaining the policy.

6. ————: Admission of Liability by Life Insurer Manifested Intention to Waive Defense of Misrepresentation. Where defendant life insurer, with knowledge of all the facts pertaining to alleged misrepresentations by insured, admitted its liability on the policy after insured's death, its conduct manifested intention to waive defense based on insured's misrepresentations.

7. ————: Abandoned Answer of Life Insurer Admitting Liability, Admissible on Issue of Waiver of Defense. In an action on a life policy, where defendant set up misrepresentations by insured that he had never raised or spat blood, defendant insurer's abandoned answer, admitting liability, etc., *held* admissible as evidence tending to establish waiver of the defense of misrepresentations; defendant insurer being entitled to explain the circumstances under which the answer was filed, making the issue of waiver for the jury with the burden of plaintiff beneficiary.

Appeal from Pemiscot Circuit Court.—*Hon. Sterling H. McCarty*, Judge.

REVERSED AND REMANDED.

*Jones, Hocker, Sullivan & Angert* and *Orville Zimmerman* for appellant.

(1) At common law a return or tender of the premiums paid on the policy was not a condition precedent

to the right of the insurer to assert a misrepresentation made in the application as a defense to an action on the policy. Kern v. Legion of Honor, 167 Mo. 406; Whitmore v. Knights & Ladies of Honor, 100 Mo. 36; Hanford v. Ass'n, 122 Mo. 50; Aloe v. Mutual Reserve, 147 Mo. 561; Hermann v. Court of Honor, 193 Ill. App. 366; Provident Savings Life Assn. v. Whaine, 93 S. W. 1053; Duncan v. Insurance Co., 44 Colo. 472, 98 Pac. 634; Seabach v. Insurance Co., 274 Ill. 516. (2) It is error to submit to the jury the question of what constitutes a "reasonable" time. Yarnall v. St. Louis, etc., Ry. Co., 75 Mo. 575; Casey v. Wrought Iron Bridge Co., 147 Mo. App. 47; Harrington v. Durham, 273 Mo. 414; Kendall Shoe Co. v. Bain, 46 Mo. App. 581; Lumpkin v. Strange, 179 S. W. 742 (Mo.); Carpenter v. Railroad Co., 119 Mo. App. 204; Couch v. O'Brien, 41 Okla. 76, 136 Pac. 1088; Lathrop v. Maddox, 58 Colo. 258, 144 Pac. 870. (3) Where the uncontradicted evidence and testimony of unimpeached witnesses establishes that a representation made by the insured in his application for a policy of life insurance is false and untrue and that the matter so misrepresented contributed to the insured's death, it is error to submit such issue to the jury and the trial court should direct a verdict for the insurer. Oglesby v. Railroad, 150 Mo. 137; Carter v. Current River Ry. Co., 156 Mo. 635; Guthrie v. Holmes, 272 Mo. 215; Gilmore v. Modern Brotherhood, 186 Mo. App. 445; Suah v. Mystic Workers of World, 196 S. W. 62; McKnally v. Brotherhood of American Yeomen, 152 N. W. 169; Pampusch v. National Council, 176 N. W. 158; Spaulding v. Mutual Life, 109 Atl. 22; McAuliffe v. Metropolitan Life, 107 Atl. 258. (4) Where there is no evidence that the refusal of the insurer to pay the proceeds claimed to be due under a policy was vexatious, the plaintiff is not entitled to recover damages and attorneys' fees, and it is error for the trial court to submit the issue of damages and attorneys' fees to the jury. Non-Royalty Shoe Co. v. Phoenix Assurance Co., 210 S. W. 37. (5) Section 7068, R. S. 1909, and the Act of March

30, 1911 (Laws of Missouri 1911, p. 282), in amendment thereof, as construed and applied by the trial court in this action, is unconstitutional and void and deprives the appellant of its property without due process of law, contrary to and in violation of the Fourteenth Amendment to the Constitution of the United States, for the reason that there is no evidence in this cause that the refusal of the appellant to pay the policy sued on is or was vexatious. Non-Royalty Shoe Co. v. Phoenix Assurance Co., 210 S. W. 37.

*W. G. Bray* and *McKay & Jones* for respondent.

The answer of the defendant filed on July 15, 1919, solemnly admitted liability and that it had completed its investigation. With this answer on file, it took a change of venue and put respondent to the expense of meeting her adversary in a foreign jurisdiction and did not deposit any of the premium money until January 6, 1920, the day of trial and almost a year after proofs of death had been submitted. Waiver and estoppel were sufficiently shown as a foundation to predicate this instruction. Harland v. Insurance Co., 192 Mo. App. 203; Bell v. Insurance Co., 166 Mo. App. 390; Rhodus v. Insurance Co., 156 Mo. App. 281.

BRADLEY, J.—This action is on an insurance policy of $1000 on the life of plaintiff's husband in which policy plaintiff was the beneficiary. The cause was filed in Dunklin county, but went on change of venue to Pemiscot county where trial was had before the court and a jury, and verdict and judgment went for plaintiff for the amount of the policy and for penalty for vexatious delay, and for attorneys' fee. Defendant filed motion for new trial, which was overruled, and it appealed.

The petition is in the usual form. The defense is alleged misrepresentations of physical conditions on the part of the insured, and that these conditions so misrepresented contributed to the death of the insured.

Defendant makes many assignments some of which are based on the questions of penalty and attorneys' fee, but plaintiff files here a remittitur of that part of the judgment, so assignments based thereon are out of the case. This leaves in effect two assignments, the one based on defendant's request for a directed verdict, and the one based on an instruction given for plaintiff.

Plaintiff contends that there was no substantial evidence to take the cause to the jury, and that it should have had a directed verdict. The application which was a part of the policy was made on March 4, 1918, and insured died on April 9, 1919, of pulmonary tuberculosis. The alleged misrepresentations pleaded and relied on by defendant are in division 9 of the medical examination, and are as follows: "Have you ever raised or spat blood? (If so give full details.) No. Have you consulted a physician for any ailment or disease not included in your above answers? No. What physician or physicians, if any, not named above, have you consulted or been treated by within the last five years and for what illness or ailment? (If none, so state). Yes. Dr. Birchett, Cardwell, Mo., 1 year ago; fully rcd."

Dr. J. G. Birchett a witness for defendant testified: "I knew Mr. Dye fifteen or sixteen years. I was his family physician and treated him from time to time during that period. I treated Mr. Dye for pneumonia and lung trouble with Dr. Back in 1914. And I treated him several times after that, but I can't—my memory is not clear as to the exact dates. I do not think I ever treated him for pneumonia more than the one time. Mr. Dye had lobar pneumonia in 1914 when I treated him. The condition of the right lung showed that the lung had been diseased prior to the incipiency of the disease—pneumonia. The pneumona left his lung in a solidified condition. Later he had an abscess formation on the lung. The abscess had the same effect on the lung as any other tissue—has a discharge of pus and you have pus-secreting membrane. I don't know exactly how long Mr. Dye had pulmonary tuberculosis, but he had it some

time prior to the incipiency of pneumonia. He had that disease at the time he had pneumonia; '14. I don't remember exactly if I saw Mr. Dye in 1916 and 1917. It seems to me he was in my office just before I went to the army. I was commissioned in the army June, 1917, and I think he was in my office that spring. He complained at that time of malaria and also sore throat— a little hoarse. He was still having trouble with the same lung when I saw him in 1917." On cross-examination this physician stated that one might have all the physical symptoms of tuberculosis and yet not in fact have it, but maintained that the disease could be correctly diagnosed without a microscopic examination. "Q. But in order to determine from the symptoms you have indicated, you have got to have the patient under you and watch the progress of the disease? A. Yes, sir; I wouldn't come in and pronounce it on the first examination. Q. Or on a second? A. No; not until I had watched his case thoroughly. Q. For a period of days and weeks? A. Yes, sir; might have all the physical signs and still not have tuberculosis. Q. Isn't it also true a man might have tuberculosis and fully recover from that? A. It is; that is, the medical profession is a little divided on that, but I don't think there is any question of gaining back his physical makeup and as stout, possibly, as he ever was in his life, and have as good health. Q. What would you say with reference to Mr. Dye, if, after he had had a spell of pneumonia in 1914, that in 1918 he regained his weight until he weighed a hundred and sixty-five pounds, he was able to do hard physical labor and perform the same manual labor that he had always performed, what would you say as to his full and final recovery? A. I would have to see the patient before answering that. Q. If his looks indicated that he had a healthy complexion and he was ordinarily fleshy and feeling well and was able to work and it didn't fatigue him, what would you say about it then? A. That depends on the physical signs; if on a physical examination I found he had no evidence of tuberculosis I would pronounce him cured and a well

man.  Q.  When he was in that condition and if you had
been the medical examiner making this examination and
you had found him in that condition and didn't detect
anything in your physical examination that indicated
otherwise, would you have reported him a good risk?  A.
I would not; no, sir.  I treated Mr. Dye during his last
illness, which I pronounced as tuberculosis.  In 1917
I told him he had to get out of that climate—I told him,
furthermore, he never would get well.  I told him after
my examination of him in 1917 that he had tuberculosis.
Mr. Dye did not leave as I recommended.  Mr. Dye
died in 1918 from tuberculosis.  I had continued my
treatment with the understanding that I couldn't do him
any good, only temporary relief; that his case was a
fatal one.  If Mr. Dye made out an application for life
insurance in 1918, I would certainly say he had lung
trouble and tuberculosis at that time.  I knew, as his
physician, that he did have it."

'Dr. Eli Black as a witness for defendant testified
that he had known insured for twelve or thirteen years;
that he treated him in October, 1914, for a severe attack
of pneumonia.  "Q.  You may state to the jury whether
or not the recovery was complete in that case, or do
you know?  A.  Well, he got up and out—he got well
enough to be around; yes, sir.  Q.  Did it leave any
permanent effect on his lungs, injuries, that you know
of?  A.  I was called to treat him a time or two after-
wards and he still had some trouble with that same
lung—on two other occasions that I know of, in con-
nection with another disease that he happened to have
along with it.  This lung was affected after the attack
of pneumonia, it was still giving him trouble.  I did
not treat Mr. Dye again for pneumonia, but I treated
him in 1916 for malaria, bilious attack and a cold, and
he had considerable trouble with his lung at that time.
In 1916, when I treated Mr. Dye, his lung was in bad
shape, it was giving him some trouble; he was coughing
and spitting and complained of his lung considerably.
He said his lung was hurting him, and I also knew it

from examining it. An abscess on the lung followed the pneumonia which he had in 1914, and he never got over it. The abscess never exactly healed; he was weak and sore from it. That condition existed in 1916 when I treated Mr. Dye for malaria—he still had a bad lung at that time. Mr. Dye spat up blood when he had pneumonia in 1914. I was Mr. Dye's regular physician at that time, and I called Dr. Birchett in consultation. I attended Mr. Dye in September, 1918. At that time he had a chill, a bilious attack of malaria, and was coughing some. I made an examination of his lung at that time and found his lung crippled and sore. I wouldn't say that he had tuberculosis at that time or not. I wouldn't know. I didn't make any examination of the sputum and never had any examination made. When I called to see Mr. Dye he would complain of that "old lung" giving him trouble. The lung partially functioned; it wasn't obliterated entirely; it just had a hole in it from the abscessed condition due to pneumonia. That condition existed in 1916. It was the

On cross-examination this physician was asked if insured had a bad spell of pneumonia in 1914, and got up and about afterwards, what he would say with reference to the recovery, and answered that he might recover all right, that lots of people recover from pneumonia, that people recover from pneumonia after they have had a bad spell. "Q. And if they live two or three years after that, is that a fine indication that they have fully recovered? A. Well, the lung is crippled at all time; that is a fact. We can detect the crippled condition from examination. It can be detected by sound, and by expansion and expulsion, and by contusion. Q. If a man had a severe spell of pneumonia in 1914 and then took a medical examination in 1918, and in that examination expanded four or five inches, what would you say about his having recovered? A. Well, that is a very good expansion; that much expansion would go to show that the man never had anything wrong with his lungs—might not have had any-

thing wrong with it. Q. If he had recovered, would he have expanded that much? A. Conditioned on how much cicatrix he had in there. If a small one, he might get over it all right, and it would never give him any more trouble as far as expansion is concerned. If the cicatrix was large enough we could detect it by sounding the chest. Mr. Dye was a medium size man, about 5 feet 8 or 10 inches; something like that. The average weight of a person in good health of that height would be from 150 to 170 pounds. If a man of that height in 1918 weighed 165 pounds I would say he was in fairly good health. As far as being absolutely sure that a person has tuberculosis, you can't tell about it until you see the lung. We have reasons to believe a man has tuberculosis when we examine him and look him over from time to time. We make up our minds a lot of times. We don't have to have a microscopic examination to satisfy our minds that a man has tuberculosis, but to be absolutely sure, to know that the bug is there, we have a microscopic examination made.''

On re-direct examination this witness testified: ''Q. If a man were to have pneumonia and leave his lungs in the condition you say this man's were left in 1914, and that continued down to 1916, and he died in 1918 from trouble with his lung, would you say that pneumonia and the abscessed condition had anything to do with his death? A. Leading up to it. Q. Would be the contributing cause? A. Yes, sir; leave a hotbed for infection, especially tubercular germs that might set up in the abscessed lung.''

Dr. C. W. Burdett testified that on February 12, 1918, that he was at the home of the insured to examine insured's son-in-law for life insurance, and that insured was present, and that on that occasion the insurance agent, for whom the witness was acting, in the course of a conversation with insured said: ''I am sorry I can't write you some insurance, Mr. Dye,'' and that the insured said: ''I am too; I would like to have some insurance,'' that then the witness asked: ''What is the

matter, what is the trouble you can't get any insurance?'',
and that the insured answered: ''Well, I just have one
lung, and no company will have me.'' E. A. Rous, the
insurance agent with Dr. Durdette testified that the con-
versation came up in a round-about way and that the
insured said that he was not insurable, that one of his
lungs was affected, and that he didn't think he was able
to pass the examination. D. T. Bryden, a neighbor of
the insured as a witness for defendant, testified that
he had known insured for about 14 years, and that insured
during that time had two spells of pneumonia, one in
1908, and one in 1914, that the insured spat blood when
he had pneumonia: ''He spoke to me about spitting
up blood. I was his close neighbor. I did not hear
him say very much about the condition of his lung after
that. I did not hear him speak much of his lungs until
about 1916. During the fall of 1916 he was taken down
with the chills and dragging around as we call it, malaria,
and he was down a good part of his time, and down
on even through 1917 he wasn't able to work and he
hired him a hand during 1917 and took a trip away
to Tennessee. I understood he went to Tennessee for
his health. His folks lived over there and he visited
them and for his health—during the summer months of
1916. He returned, if I am not mistaken, about October
or possibly November, but it was in the fall, consider-
ably helped—never better health it seems, and then he
helped to gather his crop and went on and made the
next one; he worked the next year, 1918, just the same
as I did or any other party that farming around there—
ploughing. I don't remember if he said anything to me
about tubercular trouble in 1917. He has talked to
me about some abscess he had on his lungs, I think
the doctor called it; he never talked to me himself about
consumption or tuberculosis, but he did talk about
abscesses. He said that the doctor said he had con-
sumption.'' On cross-examination: ''That was the
early fall of 1917; in October, I think. He performed
his regular manual work that winter and the next summer

he appeared to be healthy. He seemed to be on his feet and to have regained his weight. As far as I know he never complained. He continued to work after hay bailing season, after crops were over—in the winter of 1918. After that he had a chill at first—he was taken sick bailing hay that day. I saw him and he had a chill that night. He was up and down; had some chills. I don't know who treated him at that time, but I've seen Dr. Back and Dr. Birchett both treat him, and I don't know just which; I've been there time after time, but I don't know which one treated him along about that time. He performed hard work during 1917 and 1918; just such work as comes to a farmer. He ploughed all day. I never heard him complain about being fatigued. One day I asked him about being tired and he said he was not." E. C. Pope testified that in the fall of 1918 he heard the insured say that the doctors had given him up, that they said he had consumption, that one of his lungs was gone.

Plaintiff offered evidence in rebuttal, as follows: Dr. F. W. Speidel the physician who examined the insured for the policy sued on, testified that he had known the insured for twelve or thirteen years, that he was the family physician until insured moved away from the neighborhood. "I went through the ordinary practice in making the examination. I asked him all the questions there is there and had him answer them. Then I took the pulse, expansion—that means chest measure—but I don't remember what it was, now; it seems to me four or five inches expansion; I am not postive now. I did not use the stethoscope. I took his ausculation by ear. I took the expansion of his lungs with a tape and then took the expansion with tape by expiration and inspiration. Ausculation means to listen to the lungs and get rattles. I did that by the ear and percussion. You listen with the ear by putting your ear to the chest. That is the usual and ordinary method of examination. I did not detect anything in this examination which indicated to me that Mr. Dye was not a

good risk. I did not find any evidence in my examination of his having any disease of the lungs. Q. If he had had a disease of the lungs upon your examination would you have detected it? A. I think so. I recommended him as a good risk. I thought it a good risk. I knew the man for a good while and knew his condition. He was a dark-complexioned man, raw boned, and I didn't think there was any Tb about him, nor did his history show it. I did not detect anything from my examination which indicated to me as a medical doctor and a man familiar with such diseases, with reference to his having any disease of the lungs. I have treated a good many cases. I have treated patients for consumption in my . practice, especially up in Indiana, more than here. I can't state how many persons I have treated for consumption or other lung troubles because I have no record. I had a good many cases, but I couldn't estimate twenty some odd years of practice. My experience in this regard has been general. It is possible for a man to contract consumption and die in ten or twelve months. . Q. Could a man who is wholly free of consumption contract the disease and die from it in ten months? A. Mighty few men are free from it, from the Tb germ, but they are enclosed so that if his health is good he will never be bothered with it except when his health breaks down with pneumonia, bronchorhea, influenza or la-grippe, that is the quickest, following la grippe."

On cross-examination this witness stated that he asked insured if he had ever had any disease of the heart or lungs, and that the answer was "no," but that he did not rely altogether on the statements made. "Q. If the applicant states that he never had any heart or lung trouble, then, as a rule, you do not make the close examination for defects of organs as you would where they fore-warned you by their answers; that is a fact, isn't it? A. It is according to their look and statue, if perfectly healthy looking I don't. . .. . Q. I will ask you if you didn't state in your report or in that

application that one of the brothers died with lung trouble? A. Yes, sir; that's what the report says. Q. Where you find a trace of lung trouble in the family, does that cause you to give this organ more examination in the applicant than if you find no such history? A. Well, when I find that they recently died with it, then I am more careful, but over five or ten years I am not, and they are younger in age. Q. Then you didn't make any special examination for any defect of the lungs of this applicant? A. No, sir; no special examination. Q. And his answer that he had never had any lung trouble caused you to give this part of the examination less consideration than you otherwise would? A. Yes, sir." In speaking of the possible diseased condition of insured's lung at the time of the examination this witness said: "If that condition had prevailed in Mr. Dye's case, I would have detected that in his expansion and percussion. If the lung had been partially wasted away, or any portion of it gone, there would have been no expansion and there would have been dullness on percussion." H. H. Bryden testified: "I have known Mr. Dye since the year 1904, when I first got acquainted with him. I knew him and saw him often during the year 1918 and during the latter part of 1917. I lived neighbors to him from the time I first got acquainted with him. So far as I observed he was in about the usual health as an ordinary man during the fall of 1917 and the spring of 1918. He gathered his crop in the fall of 1917 and made a crop in 1918—well, he farmed every year. During the year, spring and summer of 1918, he performed the usual and ordinary field-hand service His flesh appeared to be normal. I couldn't tell any difference in his looks. I knew him prior to his having any pneumonia. I have known him fifteen years. Q. What would you say with reference to his physical condition, with reference to his looks in 1918 and '17 compared to 1904, when you first knew him? A. I can't tell there was any difference in him, only he was older than when I got acquainted with him." Plaintiff offered

in evidence a question and answer appearing in the proofs of death, the part filled out by the attending physician, Dr. J. G. Birchett, who testified as a witness for defendant. ''What disease was the immediate cause of death? Pulmonary tuberculosis. How long, in your opinion, did deceased suffer from this disease? Don't know.''

The burden was on defendant to establish its defense of misrepresentation of matters which contributed to the death of the insured, and it contends that it sustained this burden, and that plaintiff offered no evidence of a substantial character to the contrary. It is shown by Dr. Speidel that he made the usual examination, and that insured's expansion was four or five inches, that he found no evidence of a diseased condition of the lungs, and that he thought he would have discovered such condition had such been the case. The record shows that insured was 51 years old, about 5 feet and ten inches, and that his weight was 150 or 160 pounds, and that he did the usual labor on the farm in 1918. Plaintiff on the demurrer is entitled to the benefit of every reasonable inference deducible from the evidence, and such reasonable inferences are to be taken as a conceded facts, and those favorable to defendant are to be ignored. [Pringle v. Carthage Quarry Co.,— Mo. App.—, 199 S. W. 561; McCullen v. Fishell Bros. Amusement Co., 198 Mo. App. 130, 199 S. W. 439; Chulick v. Car Com., 199 S. W. (Mo. App.) 437; Ward v. Proffer, 204 S. W. (Mo. App.) 559; Brown v. Quercus Lumber Co., 202 Mo. App. 573, 209 S. W. 310.]

Our statute section 6142, Revised Statues 1919, pertinent to the question presented by the demurrer provides: ''No misrepresentation made in obtaining or securing a policy of insurance on the the life or lives of any person or persons, citizens of this State, shall be deemed material, or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether it so contributed in any

case shall be a question for the jury.'' This section has been before the courts many times, and the rulings have not always seemed consistent, but this lack of seeming inconsistency is more fanciful than real. The courts have followed the spirit of the statute, and have let each case rest upon its own facts, but reasoning by analogy from one to the other. The purpose of this statute was well stated by the Supreme Court in Schumermann v. Insurance Co., 165 Mo. 641, 1. c. 649, 65 S. W. 723, as follows: ''The act in question was in no sense intended as a general restraint upon the power of courts of equity, by proper proceedings to relieve against actual fraud perpetrated or attempted against insurance companies doing business in this State, by parties seeking insurance; but its manifest aim and object was to check and prevent the wrongs and injustice that too frequently befell the relatives and friends of the insured after their death, resulting from the growing evil practiced by life insurance companies, of calling for answers to all manner of immaterial questions from the applicant for insurance, bearing in the remotest degree, if at all, upon the risk to be assumed, and then by a general provision, incorporated in the policy to be issued, declaring that if any one of the answers to be untrue, or not as stated, it should avoid the policy, which condition without legislative aid, the courts were compelled to enforce without regard to whether the particular answer that was shown to be untrue was material to the risk or not, or whether the untrue answer was the result of an innocent mistake or an intentional wrong.''

In Bruck v. Life Insurance Co., 194 Mo. App. 529, 185 S. W. 753, where a number of similar cases are collected the policy was issued August 14, 1912, and insured died February 8, 1913. The policy there contained the provision against misrepresentations as in the case at bar. There it appeared, from the certificate of the attending physician, in the proofs of death that the insured on March 6th and 9th, 1912, was suffering from bronchitis, and that on March 13, 1912, the physician

examined the insured for tuberculosis which he "found positive." This same physician testified as a witness for defendant. Also in that case defendant introduced in evidence a written statement signed by the insured in March, 1912, in making application to another insurance company for sick benefits under a policy, in which statement the insured said that the nature of his illness was tuberculosis. Attached to this statement of the insured was a statement of a physician to the same effect. The application and the certificate of defendant's medical examiner were in evidence. In his application the insured stated that he was then in good health, had no bodily defect, and had not had within five years any sickness, ailment or disease, and that neither he nor any member of his family had ever had tuberculosis. The medical examiner in his certificate stated that the appearance of the insured indicated health and vigor; that there was "no indication by ausculation and percussion of any disease of respiratory organs," that there was nothing in the applicant's appearance, and mode of living which, in the opinion of the medical examiner, would tend to shorten life, and that he, without reservation, recommended the applicant as safely insurable. There was non-expert evidence by the plaintiff who was the mother of insured that the insured at the time the policy was issued was in good health, and other non expert witness intimately associated with the insured gave evidence to the effect that at least prior to the issuance of the policy insured was a strong, healthy and vigorous young man who took an active part in athletic sports. The court there says that this character of evidence tended to show that the insured at the time the policy was issued was not suffering from tuberculosis. The court in passing on the demurrer in the Bruck case said: "It is quite clear that the case made was one for the jury, and that the trial court could not have sustained a demurrer to the evidence without doing violence to both the letter and the spirit of our law. It is true that there is much and very persuasive evidence in this record

tending to show that the insured was, at the time of his application, suffering from the disease which resulted in his death less than six months later, and tending to convict him of false and fraudulent misrepresentations in making application for the policies. But it was not within the province of the trial court to pass judgment upon the facts, and we likewise are without power so to do.'' On motion for rehearing the court distinguished that case from Stephens v. Ins. Co., 190 Mo. App. 673, 176 S. W. 253. The Bruck case is cited and followed in Manning v. Insurance Co., 202 Mo. App. 124, 213 S. W. 879. In view of the evidence in the instant case, and the authorities we hold that the court committed no error in submitting the cause to the jury on the issues raised by the demurrer. It is not the province of an appellate court to pass on the weight of the evidence. That duty is one for the triers of the facts, and where there is substantial evidence to support a verdict, absent error, such finding will not be disturbed.

The instruction of which defendant complains is as follows: ''The court further instructs the jury that if they find and believe from the evidence in this cause that defendant, after it had full knowledge of all the facts connected with the application and issuing of the policy sued on herein, and after it had sufficient length of time after the death of the deceased, William F. Dye, to make an investigation and did make an investigation and in said investigation it learned all the facts connected with the making of the application and issuing of the policy, and after learning of said facts it retained the premium paid by the insured herein upon the policy sued on for an unreasonable time and did not tender back or offer to tender back said premium, then and in that event the jury are instructed that defendant has waived its right to rely upon any misrepresentations made in the application for said policy, and defendant is now estopped from asserting any misrepresentations as a defense to this action.''

In order properly to understand the theory on which this instruction is based it is necessary to state some further history of this cause. Insured died on April 9, 1919, and on April 23rd thereafter W. G. Bray, Esq., representing plaintiff, forwarded proofs of death to defendant's St. Louis office. Defendant acknowledged receipt on April 24th, and advised that the proofs had been forwarded to the home office for attention. No immediate attention seems to have been given, and on May 22nd Bray wrote asking what was the trouble with the Dye claim, and not receiving a reply, suit was filed June 13th. On June 16th Bray advised defendant of the suit by letter, and expressed a desire to settle without litigation. Arrangements were thereafter made to settle, and on June 25th at the directions of Mr. Bray defendant sent check for $1007.99 payable to plaintiff to cover policy and dividend to Bank of Senath, with instructions to the bank to deliver the check in exchange for the policy. At same time, and in same letter defendant wrote Bray that it would pay the costs accrued, and directed that the bank draw for the costs, or notify amount and check would be sent to cover. Bray had written on June 24th giving the instruction above mentioned, but on the following day he wrote "in my hurry yesterday in offering a settlement I overlooked the penalty imposed by the statutes of attorney fee of $150. Therefore, I hereby notify you that this attorney fee will be added to the costs of the court and I ask that you arrange to pay same with the Bank of Senath." On June 30th Bray again wrote about overlooking the attorney's fee, and also mentioned the penalty of ten per cent for vexatious delay both of which were asked for in the petition, but stated that he would abandon the ten per cent penalty if payment of the policy and $150 for attorney's fee was made. July 1st defendant advised that it could not settle for the attorney's fee claim, but stood ready to pay the policy the check for which was then at the bank. The check was returned, and on July 15th defendant filed answer admitting the

issuance of the policy; payment of premiums; death of the insured, and proofs thereof. Defendant to justify the delay and defeat the claim for penalty and attorney's fee alleged in this answer that the proofs of death did not contain sufficient information to enable it to properly pass on the claim; that in said proofs it was stated that insured died of tuberculosis, but that it was not stated for what period of time insured had tuberculosis, and that for this defect in the proofs defendant sought further information, and undertook to make the necessary investigation to determine the period of time insured had tuberculosis. That while making the investigation and while endeavoring to secure information as to how long insured had tuberculosis plaintiff filed suit. "That thereafter, on or about the 23rd day of June, 1919, defendant, *having completed its investigation* (italics ours), concerning the period of time that the insured had been afflicted with tuberculosis prior to his death, recognized its liability under said policy and agreed and notified plaintiff that it would pay the amount . . . and also the court costs." Then this answer pleads the facts pertaining to the correspondence with Bray, and the sending of the check, etc., after which is says: "Defendant admits its liability to the plaintiff herein for the amount of the policy sued on herein, together with accrued dividends."

On August 14th defendant filed its application and affidavit for a change of venue and the cause went to Pemiscot county. On January 6, 1920, the day of trial, defendant filed in the Pemiscot court its amended answer in which it set up the alleged misrepresentations, denied liability, and deposited in court for plaintiff's benefit the premiums paid. Plaintiff replying in effect alleged that after defendant was advised of all the facts that it filed its answer admitting liability, made no offer to return the premiums for nearly six months, but retained said premiums and was now estopped to plead the alleged misrepresentations in defense. The instruction complained of predicates waiver upon the

proposition that defendant, after it knew all the facts pertaining to the alleged misrepresentations, failed to tender back the premiums within a reasonable time. The statute, section 6145, Revised Statutes 1919, provides: "In suits brought upon life policies, heretofore or hereafter issued, no defense based upon misrepresentation in obtaining or securing the same shall be valid, unless the defendant shall, at or before the trial, deposit in court for the benefit of the plaintiffs, the premiums received on such policies." This statute says no defense, etc., shall be valid unless the defendant shall *at* or *before* trial deposit in court, etc. Unless the statute is ignored the defendant could not be held to a waiver in the respect here contended by failing to make a tender *within a reasonable time* after it learned the facts of the misrepresentations. The statute clearly means that no matter when the defendant becomes *advised* of the misrepresentations it will not by merely knowing the facts be deprived of such misrepresentations as a defense provided it deposits in court the premiums at or before trial. The element of waiver in this cause is the alleged fact by plaintiff in her reply that defendant after making the investigation and learning all the facts concerning the alleged misrepresentations then *admitted liability*. But this element of waiver is wholly separate and distinct from the question of a tender of the premiums. Failing to tender back the premiums, in view of the statute, is no evidence of a waiver, because the statute has specifically provided for this feature.

Defendant on trial below offered evidence by its attorneys that when the first answer was filed stating that an investigation had been made, that there had in fact been no investigation made, and that the answer was filed by counsel under a misapprehension of the true facts. Plaintiff offered nothing to contradict this explanation except the answer wherein it was stated that an investigation had been made, and that liability was admitted. We think that if defendant in truth knew

all the facts pertaining to the alleged misrepresentations, and with these facts known thereafter admitted its liability, that such conduct would manifest an intention to waive the defense based upon misrepresentations. The answer offered in evidence by plaintiff wherein it was stated an investigation was made, and wherein liability was admitted, would be evidence tending to establish waiver, but defendant could explain the circumstances under which the answer was filed, and the issue would be for the jury, with the burden on plaintiff to establish the waiver. The admission in evidence of the abandoned pleading was competent evideece. [Spurlock v. Railroad, 125 Mo. 404, 28 S. W. 634; Henderich v. Railroad, 159 Mo. App. 190, 140 S. W. 613; Young v. Ins. Co., 269 Mo. l. c. 14, 187 S. W. 856.] The facts pertaining to the admission of the answer in the case at bar do not come within the rule laid down in Koons v. Car Co., 203 Mo. 227, 101 S. W. 49, relied on by defendant to support its contention that the answer was not admissible in evidence. There to have permitted the answer as competent would have been permitting the plaintiff to take advantage of his own wrong. But such is not the case here. The statute, section 61b5, Revised Statutes 1919, does not prevent defendant from waiving the defense of misrepresentation if it chooses to do so, but merely makes certain the right to defend on misrepresentations, where there is no waiver, if the premiums are deposited at or before trial. Plaintiff contends in effect that she relied on the assumption that defendant would make no contest except as to the penalty and attorney's fee because of the nature of its first answer, and that defendant deceived her to her hurt when it after taking the cause from her county filed its amended answer setting up the defense of misrepresentations. Plaintiff made no suggestion that she was taken by surprise, but went to trial. If plaintiff desires to rely upon the question of waiver she should so frame her instruction to conform it to the proposition that defendant knew

the facts, and thereafter admitted liability, and eliminate any reference of failure to tender premiums. The judgment below should be reversed and the cause remanded, and it is so ordered. *Farrington, J.,* concurs. *Cox, P. J.,* not sitting.