CARLTON SIMMONS, *pro ami*, Appellant, v. KANSAS CITY JOCKEY CLUB.
—66 S. W. (2d) 119.

Division One, December 6, 1933.

*Clay C. Rogers, Mosman, Rogers & Buzard* and *Louis N. Wolf* for appellant.

*Paul C. Sprinkle* and *Inghram D. Hook* for respondent.

102

FRANK, P. J.—Action by plaintiff, appellant here, to recover damages for personal injuries. Verdict for plaintiff in the sum of $32,000. On motion of defendant, the court set the verdict aside and granted a new trial. Plaintiff appealed.

Plaintiff's petition, among other things, alleges the following facts:

"Now comes the plaintiff by his next friend, Paul A. Buzard, who had been duly appointed as such to prosecute this suit in the name of and on behalf of the plaintiff, and for his cause of action the plaintiff states that he is a minor seventeen years of age and at all times in question has followed the occupation of a jockey and plain-

tiff states that the defendant is a corporation duly organized and existing according to law and engaged in the business. of maintaining and operating horse racing exhibitions and during all of the times herein mentioned, it has owned and operated a horse. racing track at or near Smithville, Missouri.

"Plaintiff states that on the 31st day of August, 1927, he was engaged by one Ben Keller, to ride in a horse racing exhibition which was on said date held and maintained on the track of defendant company at said place, and plaintiff states that at said time there were a number of horses in said race and that while plaintiff was riding a horse known and called Anmeter, and owned by the said Ben Keller, the said horse bolted and was by and through the carelessness and negligence of the defendant as hereinafter more specifically set out, caused, permitted or allowed to run through an opening. or gap in the fence around said track, whereby plaintiff was caused to be thrown from said horse and seriously, grievously, and permanently injured and crippled.

"The defendant operated and maintained the race track. at the place in question and on each side of the track there had been built and constructed a fence between which said fences the horses were raced. The outer fence was so constructed that at various places gaps or gates were left in said fence and said gaps or gates were usually or customarily closed by bars or gates so as to prevent the racing horses from leaving the track and going through the gaps or gates, and plaintiff states that it is the well known propensity, tendency, or inclination of race horses to bolt from the track and leave the same through any gate or opening in the fence, and plaintiff states that said propensity, tendency, or inclination and conditions were at and before the time plaintiff was injured, well known to the defendant and that because of the likelihood of race horses to bolt through an open gate or gap, the duty was upon the defendant to keep barred and closed said gates and gaps so as to prevent race horses from bolting from said track, but plaintiff states that the defendant in violation of its obligation and duty to the plaintiff negligently and carelessly permitted a gate or gap to be open and unbarred in said fence before the time the race started and while the race in which plaintiff was injured was in progress, and that by reason and because of the negligence and carelessness of the defendant aforesaid, and while plaintiff was riding, said horse in the race aforesaid, the said horse upon reaching said unbarred and open gate or gap in said fence bolted from the track and went through said gate or gap and threw plaintiff against and upon a post in said fence and the adjacent ground with such force and violence as to cause him to be injured in the manner aforesaid."

Defendant's answer pleads (1) a general denial, and (2) that plaintiff was in the employ of defendant, and that both plaintiff and

defendant were subject to and operating under the Workmen's Compensation Act of Missouri, and that plaintiff's rights, if any, are measured by said act. The reply was a general denial.

■ The order of record granting a new trial assigned as a ground therefor that error was committed in giving plaintiff's Instruction No. 1. Appellant contends that the granting of a new trial on the ground assigned was erroneous. Respondent contends the contrary, and in addition insists that other errors committed during the course of the trial, not assigned by the court as a reason for granting a new trial, justified the court's action. In this situation, the burden is on appellant to show that the court erred in granting a new trial on the ground assigned, while respondent has the burden to discover and point out errors, if any, not assigned by the court, sufficient to justify the court's action in granting the new trial. [Smith v. Kansas City Public Service Company, 328 Mo. 979, 43 S. W. (2d) 548, 554; Yuronis v. Wells, 17 S. W. (2d) 523, 322 Mo. 1029; Macklin v. Construction Company, 326 Mo. 38, 31 S. W. (2d) 14.]

■ Respondent contends that the court erred in refusing its requested Instruction K.

This instruction reads, "The court instructs the jury that the plaintiff was an employee of defendant and, therefore, your verdict shall be for defendant." The contention that error was committed in the refusal of this instruction is based on the claim that plaintiff was in the employ of defendant; that both were subject to and operating under the Workmen's Compensation Act, and for that reason the Compensation Commission and not the courts has jurisdiction of plaintiff's claim.

Conceding that defendant was operating under the Compensation Act, plaintiff would not be subject to the act unless he was in the employ of defendant. Plaintiff's Instruction No. 1 which directed a verdict for plaintiff, required the jury to find, among other things, that plaintiff *was not* in the employ of defendant at the time in question. If there was any substantial evidence authorizing the submission of that question to the jury, its finding thereon is conclusive on this court.

Plaintiff's action was at common law and invoked common-law liability. Whether or not plaintiff and defendant were subject to the Workmen's Compensation Law was an affirmative defense, with the burden on defendant to plead and prove that defense. [Lally v. Morris, 26 S. W. (2d) 52, 55; Kemper v. Gluck, 327 Mo. 733, 39 S. W. (2d) 330, 333.] Defendant affirmatively pleaded a state of facts, if true, would authorize a finding that plaintiff was in the employ of defendant and that both were subject to the provisions of the Compensation Law. Plaintiff filed a reply in which he denied the affirmative defense pleaded, thus raising an issue of fact regard-

ing plaintiff's employment, with the burden on defendant to prove that fact.

The record shows that defendant is a corporation engaged in maintaining and operating horse racing exhibitions and owns and operates a race track at Smithville, Missouri. Plaintiff was a free lance or apprentice jockey. A free lance jockey is one not in the regular employ of any horse owner. They attend race meets in the hope of securing employment as a jockey to ride in races for any horse owner who has no regularly employed jockey. These jockeys are required to obtain a license from the racing association before they are permitted to ride in any race. Plaintiff was given such a license by the defendant, Jockey Club, to ride as an apprentice jockey during the race meet in question. In the application for such license, plaintiff agreed to obey the racing rules of defendant club. A free lance jockey usually has an agent who secures mounts for him to ride. In this instance plaintiff's brother acted as his agent.

The evidence offered on behalf of plaintiff was to the effect that the horse owner not only hires the jockey but directs him how to ride the horse and pays him for his services; that the Jockey Club has nothing whatever to do with instructing the jockeys as to how to ride the horse. Coming to the race in which plaintiff was injured, the evidence is that plaintiff's brother went to one Keller, a horse owner, and secured from him employment for plaintiff to ride Keller's horse in the race in question. Keller testified as follows:

"I owned the horse that Carlton Simmons rode on the 31st day of August, 1927, when he was hurt. . . . Simmons was riding for me, riding my horse. I paid him five dollars. He was a jockey licensed by the association or club. That was the practice and custom at every club that the jockeys get a license before they were permitted to ride. The jockeys ride for the man who pays them; they ride his horse. . . . I think it was Carlton's brother who came to me and asked me to permit Carlton to ride the horse."

Merrell Simmons, plaintiff's brother, testified:

"Q. Your brother was up there riding free lance wasn't he? A. Yes sir, there he was.

"Q. And there for the convenience of the horse owners and whoever wanted to hire him? A. Yes, sir.

"Q. Or he could be selected by the Jockey Club and picked out by them for the owner? A. No, sir, he couldn't. The Jockey Club has nothing to do with no boy, or owner or nothing in engaging mounts or anything or where to enter his horse. They haven't anything to do with that."

The witness further testified:

"I was at Smithville in the late summer of 1927. I was engaging mounts for Carlton. The owner hires the jockey. The owner's

money pays the jockey. The owner or trainer gives the jockey instructions how to ride. The trainer works for the owner and takes orders from him. The Jockey Club has nothing whatever to do with giving instructions to the jockey as to how to ride the horse.''

The witness further testified that if a jockey proved incompetent or was guilty of misconduct such as drunkenness or dishonesty, the Jockey Club could fine him, or suspend him or rule him off the track. He also testified that for such conduct the horse owner could "punish him, set him down." This witness also testified that if the club was not satisfied with a jockey who was going to ride a race, it could put another boy on that horse, and if the horse owner was not satisfied with the change of jockeys, he could withdraw the horse. The witness later explained what he meant by his testimony regarding the change of jockeys. He testified that it sometimes happened that two horse owners would claim the right to the services of a jockey in the same race; that the jockey usually looks for the best horse; that the books of the club show which owner has the first call on the jockey, and the dispute is settled by what the books show. The fact that the club reserves the right to settle such disputes between horse owners and to exact exemplary conduct from the jockey while on its premises, does not conclusively show, as a matter of law, that the jockey was in the employ of the club, or that the club had the right to or did direct or control the jockey by telling him whom he should ride for or how he should perform that service. Otherwise stated, as the races were being conducted on the premises of the club, the club had a lawful right to make reasonable rules governing the orderly conduct of the races, and exact obedience to such rules by all parties participating therein, whether they be employees or strangers.

In addition to the evidence to which we have called attention, it appears that defendant, at one time, admitted that plaintiff was not in its employ. The record shows that defendant carried a policy of insurance with the United States Fidelity and Guaranty Company, indemnifying it against loss occasioned by injury or death of persons *other than its employees,* arising out of the operation of said race track. After plaintiff in the instant action was injured, the defendant brought suit on said insurance policy against the United States Fidelity and Guaranty Company, presumably to recover the amount it had incurred and paid out for doctor bills, hospital bills, etc., occasioned by plaintiff's injuries, expressly alleging in said suit that Carlton Simmons *was not* in its employ at the time he was injured. The petition in that case was introduced in evidence in the present action.

The attorney representing the Jockey Club in the suit against the insurance company testified that the club authorized him to bring that suit. On cross-examination concerning the allegation in the

petition that Carlton Simmons was not in the employ of the Jockey Club, he testified.

"Q. But you drew your own conclusions as to whether there was employment or not employment? A. I don't know whether you would call it a conclusion or not. I was told he was not employed."

■ It is settled law that a pleading filed by a party in a cause, which states facts relevant to the issues in another cause on trial, in which the party filing such pleading is also a party may be read in evidence in such cause, against the party making it as an admission. While such admission is not conclusive, it amounts to substantial evidence tending to prove the facts admitted. [Dye v. N. Y. Life Insurance Co., 207 Mo. App. 540, 560, 227 S. W. 1062; Lynch v. Railroad, 208 Mo. 1, 19, 106 S. W. 68; Snyder v. Railroad, 112 Mo. 527, 541, 20 S. W. 885; Boothe v. Cheek, 253 Mo. 119, 129, 161 S. W. 791.] The petition introduced in evidence wherein the Jockey Club expressly alleged that Carton Simmons was not an employee of said club was competent evidence tending to establish that fact, the weight and value of which was a question for the jury to determine. It cannot be said that the alleged admission was not the admission of a fact, but was an opinion and conclusion and for that reason was not admissible as evidence. There is a distinction as to the admissibility of a declaration made by a mere witness, and a declaration made by a party to the action. The opinion rule does not limit the use of a party's admissions. The reason for the rule does not apply to a party's admissions. [Grodsky v. Consolidated Bag Co., 324 Mo. 1067, 26 S. W. (2d) 618, 621, and cases cited.]

We need not discuss or consider the evidence offered by defendant touching the question of plaintiff's employment. The burden being on defendant to prove that plaintiff was in its employ, the evidence offered by it in that behalf being entirely oral, the weight and vaue of such evidence as well as the credibility of the witnesses giving it, were questions to be determined by the jury and not by the court. [Lally v. Morris, 26 S. W. (2d) 52, 55; Ford v. Wabash Railway, 318 Mo. 723, 300 S. W. 777; State ex rel. Missouri Gas & Electric Co. v. Trimble, 307 Mo. 536, 271 S. W. 43, 47; Cluck v. Abe, 328 Mo. 81, 84, 40 S. W. (2d) 558.]

■ If it should be conceded that plaintiff was in the general service of the Jockey Club, it would not follow that he was the servant of the club while riding in a race. Keller, the horse owner, employed plaintiff, directed him how to ride the horse and paid him for his services. The club cannot select a jockey for the horse owner, nor instruct the jockey how to ride the horse. The license issued to the jockey by the club simply permits the jockey to ride in races so long as he does not violate the rules of the club. The facts concerning the relation between Simmons, the jockey, and Keller, the horse owner, were such as to bring this case within the rule, that although

one may be in the general service of another, nevertheless with respect to particular work, he may be transferred with his own consent to the services of a third party, so that in the performance of such duties he becomes the servant of the third party with all the attendant legal consequences of the new relation. The St. Louis Court of Appeals so held on a state of facts similar in most respects to the facts in this case. [Biskup v. Hoffman, 287 S. W. 865, 868. See, also, Maher v. Donk Bros. Coal & Coke Co., 323 Mo. 799, 807, 20 S. W. (2d) 888; Clayton v. Brick Co., 324 Mo. 1176, 1193, 26 S. W. (2d) 969.]

Plaintiff's Instruction No. 1 required the jury to find that plaintiff *was not in the employ of defendant,* as a condition precedent to a verdict in plaintiff's favor. The evidence warranted the submission of that issue to the jury, and its finding thereon in favor of plaintiff is conclusive on us. The many cases cited by defendant in support of its contention that plaintiff was in its employ may be distinguished from the instant case because of the difference in their fact. Without analyzing each of these cases, one important difference in the facts will suffice. In the case at bar, it was shown that defendant herein, in a suit brought by it against the insurance company expressly admitted that plaintiff *was not* in its employ at the time he was injured. Had the burden been on plaintiff, this admission, standing alone, would have been sufficient to take the question of plaintiff's employment to the jury. No such fact appears in any of the cited cases.

It is next contended that if it should be held that plaintiff was in the employ of the horse owner, still plaintiff would be subject to the Workmen's Compensation Act because the horse owner was either an independent contractor or an employee of the Jockey Club.

A sufficient answer to this contention is that there is no evidence in the record tending to show that the Jockey Club contracted with or employed Keller, the horse owner, in any capacity whatsoever. The maintenance and operation of the race track by defendant was an implied invitation to all horse owners and jockeys to attend and participate in the races. "An invitation of the owner or occupant of premises is implied by law where the person goes on the premises for the benefit, real or supposed, of the owner or occupant, or in a matter of mutual interest, or in the usual course of business, or for the performance of some duty." [4 Words & Phrases (Third Ser.) p. 526.] Without doubt, both the horse owner and plaintiff were invitees and defendant owed plaintiff the duty to exercise ordinary care to prevent his injury. [North Manchester Tri-County Agr. Assn. v. Wilcox, 4 Ind. App. 141, 30 N. E. 202.]

Defendant next contends that its demurrer to the evidence should have been sustained because no actionable negligence was proven.

Plaintiff offered evidence to the effect that it was a well-known fact that race horses have a tendency or inclination to bolt from the track and leave the same through an open gate or gap in the fence; that it was the general custom and practice on defendant's track as well as on other tracks to keep all gates or gaps in the fences closed in order to prevent the horses from running out. Some of defendant's witnesses testified to the same effect. Plaintiff's evidence further showed that the gate or gap in question was open prior to and during the race, and that the horse plaintiff was riding left the track, bolted through the open gate or gap in the fence; threw plaintiff against a post in the fence and to the ground, thereby seriously and permanently injuring him. Defendant's contention is that there was no testimony from which it might be fairly deduced that plaintiff's injuries were caused by the horse bolting through the particular gate or gap, when there was evidence that a race horse might bolt at any time or place. Although race horses sometimes bolt and attempt to leave the track through the fence at a place where there is no opening, in view of their well-known inclination to bolt and leave the track through an opening in the fence, the fact that the horse in question chose the open gate as a place to bolt and leave the track tends to show that the opening in the fence was the inducing cause of his bolting.

Defendant contends that the court was warranted in granting a new trial because of the giving of plaintiff's Instruction No. 1. The contention is that the instruction was erroneous (1) because it did not require the jury to find that defendant knew, or by the exercise of ordinary care could have known that the gate or gap in question was open, (2) because there was no evidence that defendant knew or by the exercise of ordinary care could have known that the gate or gap was open in time to have closed it before plaintiff was injured.

This contention cannot be sustained. The instruction required the jury to find that defendant negligently failed to keep and maintain the gap or gate closed or barred at and during the race in which plaintiff was riding. The defendant could not have *negligently* failed to keep and maintain the gate closed unless it knew or by the exercise of due care could have known the gate was open. It therefore follows that the requirement in the instruction that the jury find that defendant *negligently* failed to keep and maintain the gap or gate closed at or during the race, was equivalent to a requested finding that defendant knew or by the exercise of ordinary care could have known that the gap or gate was open. [Messing v. Judge & Dolph Drug Co., 322 Mo. 901, 18 S. W. (2d) 408, 418; Kamer v. Missouri, Kansas-Texas Ry. Co., 326 Mo. 792, 32 S. W. (2d) 1075, 1082; Hulsey v. Tower Grove Quarry Co., 326 Mo. 194,

30 S. W. (2d) 1018, 1028; Berberet v. Electric Park Amusement Company, 319 Mo. 275, 3 S. W. (2d) 1025.]

■ In this connection contention is made that there was no evidence tending to show how long the gate had been open, or that defendant knew or could have known it was open in time to have closed it before plaintiff was injured.

We do not so read the record. But regardless of what the record shows on that question, it does show that the gate was in the keeping and under the control of defendant. The record does not show who left the gate open, but as the defendant was the keeper of the gate, it would not be an unwarranted inference that the keeper did it. A like question was before this court in Crawford v. Stockyards Co., 215 Mo. 394, 417-8, 114 S. W. 1057. In that case the plaintiff was injured by an open gate. An instruction given for plaintiff contained the following clause, "and that while going down the ladder on and swinging around said car plaintiff . . . was struck and knocked off said car by a gate of defendant, and that said gate had been negligently left open by defendant's employees," etc. This clause of the instruction was criticized on the ground that there was no evidence tending to show it was defendant's employees who left the gate open. In disposing of that contention we said:

"There was no express evidence as to who left the gate open. But if the gate was open as and when plaintiff says it was, was it an unwarranted inference that it was left open by defendant or some of its employees? If the gate was open and plaintiff was hurt by it, did it devolve upon him to prove who opened it? If so, then, in a case like this, there would be no remedy for the injury. The gate was in the keeping of the defendant and if it was left in a negligent manner and no testimony showing who did it, the inference would naturally be that the keeper did it. There was no error in that instruction."

The above holding was quoted approvingly in the recent cases of Kennedy v. Phillips, 319 Mo. 573, 5 S. W. (2d) 33, 39. The contention is ruled against defendant.

Other complaints are made against the instruction, each of which we have given consideration, but do not regard them of sufficient moment to merit discussion.

■ Further contention is made that plaintiff's Instruction No. 2 is erroneous.

The instruction is short. It reads as follows:

"The jury are instructed that by the word 'employee' as used herein means a person employed to labor for the pleasure or interest of another or one employed to render service or assistance in some trade or vocation and one over which the employer retains the right to direct the manner in which the work shall be done, and not only

what shall be done, but how it shall be done and who the employer has a right to hire and discharge.''

This instruction correctly defines the word "employee." [39 C. J. 33, 35.]

The final contention is that the verdict is excessive.

■ This contention necessitates a review of the evidence touching plaintiff's injuries. Plaintiff fairly states that evidence which, in substance, is as follows:

"Dr. Clyde O. Donaldson, an X-ray expert, testified that he made X-ray pictures of the plaintiff's spine and found that the fifth lumbar vertebra had been compressed or mashed, the injury entered the lamina, as well as the body of the fifth lumbar, and that there was a deformity of the transverse process on the right side, quite a deformity, and where you have an injury to the fifth lumbar vertebra sufficient to break through the lamina of the vertebra and into the canal where the nerves are contained, you would probably have an unusual condition of the bladder and other vital organs. He testified that he observed the plaintiff and noticed that his gait was abnormal, that he was not able to bend like he should, that he limped when he walked, and from his X-ray findings and clinical observation, he found that the plaintiff had an injury to the sacroiliac joint which stiffened his back and interferes with the action of the back, and has a tendency to weaken his back and to disable him from performing labor and cause him inconvenience and discomfort upon exertion. He testified that in his opinion the condition was permanent and disabling.

"He further testified that there was an injury to the crest of the ilium with a result deformity; that his back muscles are attached to the crest of the ilium and the injury interferes with locomotion.

"Dr. J. Park Neal, a surgeon, testified that he had examined the plaintiff, found that on his abdomen there were healed scars of infected wounds, three in number, two of considerable extent, one on the right side of the abdomen and the other on the left. The scars were healed with considerable loss of tissue on the part of the abdominal wall, leaving the wall devoid of muscle at the site of the scars and the abdominal contents protected only by the skin and thin scar tissue; that both of those infected healed scars are weak places, which are potential hernias; he found considerable deformity of the crest of the ilium, and that the plaintiff's back at the sacrum shows considerable deformity of the junction of the ilium with the sacrum, and over that deformity is the healed scar of the infected wound. He observed his walk and saw that he drags his right foot slightly, indicating some disturbance of balance due to the deformity of the sacrum and sacroiliac joint; that he interpreted the X-ray pictures and observed that there was a fracture of the right transverse process of the first lumbar vertebra, also a fracture of the transverse process of the fifth lumbar vertebra with the fracture extending into

the wing of the sacrum; that the picture also shows an exostosis or deformity of the crest of the right ilium and the right sacral notch is somewhat higher than the opposite side, and apparently the pubic bone on the right side is slightly higher than on the left. The change of the pelvic bone would be due to the fracture of the sacrum and the disturbance of the sacroiliac joint. as well as the fracture of the wing of the ilium. The condition is disabling. The deformed condition of the pelvis and the fact that the pelvic girdle or ring is the base which supports the body above that and is the fixed point from which the hip works accounts for the fact that he drags his right leg. The ability to lift and use the upper part of the body depends upon the stability of the sacroiliac joint. The doctor gave it as his opinion that he was not able to do manual labor and never would be able to do work or labor because of the injuries.

"The doctor further testified that, while frequently you could repair a rupture by an operation, it was not true of this particular case, as there is not sufficient good tissue around the scars to permit the repair of such a potential rupture.

"Dr. Frank Hurwitt testified that he was employed by the Jockey Club as their physician to look after the injuries of the jockeys and that, when the plaintiff was injured. he took him to the Research Hospital in Kansas City; that plaintiff was confined to the hospital for a period of close to six months; that he was unconscious for eight or ten days and was irrational for some time after that, perhaps another week or so; that we operated on him six or seven times, not counting the blood transfusions, for obstruction and for multiple abscesses on his back and we had to do a colostomy on him, that is, we had to make an artificial anus through which he could evacuate his bowels through the abdomen and then we had to go back and close the ileoileostomy and colostomy, and I think there were about seven operations. Each time he went to the operating room, I thought it would be the last time. I didn't think he would get through but he did. He developed pneumonia, and developed an abscess under the diaphragm which had to be drained.

"The doctor further testified that he examined him three or four days before the trial. In giving the result of that examination he said:

" 'He is not a strong boy, never will be after what he went through. He seems to tire very easily, gives out. He has a sort of drag of the right leg when he walks. I examined his back and found that the right side of his back, that is, the crest of the ilium, is a good deal more prominent than on the left side. The X-ray picture shows that the fifth lumbar vertebra is fractured.' "

" 'There must have been a strained condition of the sacroiliac when the boy was injured because he would not limp this way and drag his leg unless there was some condition of that kind. When he

was in the hospital, they had to catheterize him, draw his urine with a catheter. In my opinion, that condition would come from an injury emanating from the spinal cord through the fifth lumbar. His failure to hold his water would indicate an injury to the nerve that supplies the bladder.'

" 'In my examination of him the other day, I examined his abdomen and he hardly has any muscles there at all. Several places along the abdominal wall are very weak and the potential hernias are there now. I also examined his heart. It beats faster than normal. There was an amount of pus and poison in his system at the time he was in the hospital. The blood stream will absorb a certain amount of it. It probably caused the condition of the heart, weakening it. A fast heart is always a weak heart. He has a fast heart now and a weak heart. He couldn't do manual labor without giving out. I would say he never could do heavy work. He will never be able to do any manual labor that would require any manual strength on his part.'

" 'He had multiple abscesses along his back. The boy was practically paralyzed. He was not able to move a muscle, a leg or an arm. He was going down very fast, and we knew that if he did have an injury to his back, we would not be able to do any more for him than he was doing himself.'

" 'Whenever we cause a drain in any part of the intestinal tract, of course the juices which normally act upon our food when we take it into our intestines will seep out and will eat up the muscles and tissues, especially where the drain exists there for any length of time, and that is what happened in this case, that the muscles and tissues and fascia, the covering of the muscles, were all eaten up by the juices that come through the drain. When the muscle is gone, it is gone, we can't put it back.'

"Dr. Grover Burnett, a neurologist who examined the plaintiff, testified that he had made an examination of the plaintiff shortly before the trial and found from his neurological examination that he walked in an unbalanced way; his facial expression was one of confused nature; the left side of his face showed that he had an old facial paralysis, and the examination of his tongue showed it considerably out of balance, due to a degree of paralysis; he was very much out of balance, and his right foot was not a weight bearing leg, it would give way at the hip; the reflexes of his right leg were present but low; that there had been an injury to the direct motor tract that goes into the brain; that his knee reflex was spastic, overdone, exaggerated reflex, which showed that the brain tract that furnishes power to run muscles had been injured; there was evidence of fracture to the fifth lumbar vertebra and also an injury to the sacroiliac joint; that the plexus of nerves which supplies the entire leg, hip and thigh was implicated in the injury, and that the paralysis ex-

tended to the external genitals, giving a paralysis of the right half of the penis, and also interfered with the control of his urine; that he has a partial paralysis of the right leg; that in his opinion, the conditions mentioned were serious and permanent.

"Plaintiff's father testified that his mental condition was not as it had been before. Plaintiff testified that his jaw teeth were broken off and shattered, enamel broken off of both upper and lower teeth. which has caused him pain and discomfort. He detailed serious and painful conditions that he suffered in the hospital, not least among which was the method used in giving him nourishment through the veins by sticking needles into his arms and chest. He further testified:

" 'I tried to fight them when they first started to give me hypodermics in the chest but I finally came to the conclusion that they were going to give them anyway. They were large needles. When they first started, it took from forty-five minutes to an hour, but it got where it would take from an hour to an hour and forty-five minutes to absorb seven c.c. of water in the flesh. They would do it once a day if I was better, and if I wasn't so well, two and three times. They did that three months in one stretch every day; my arms became so sore and swollen I could not move them; I could not raise them from the side; I lay in bed in one position for three months; I lost my appetite for food; from the left hip to the top of the right hip was just as raw as a piece of beefsteak. It was sensitive and would pain when touched with cotton. I had an abscess on my lung; they did not give me an anesthetic when they operated on the abscess, just held me down by force and cut me open; it was a painful operation; I was in the hospital five months and twelve days; it was four and a half months before I was ever on my feet; I had to learn to walk over again; I have done no manual labor since I got hurt; my stomach feels like every step I am going to take would be the last one for me, like it was going to bust out; I wear a support around by abdomen; I cannot control my urine. In walking, I have a tendency to drag one foot. I am not able to fully control my right leg. My right hip is higher than the left. They put ice packs on my head at the hospital for practically four and a half months; I had sick headaches all the time; since I have been out of the hospital I have suffered pains in my head; I have sick headaches frequently, and another thing, when I bend over and straighten up, I have a tendency to just be blind, blind staggers. I have no strength now at all. Before I was hurt there was nothing wrong with my back or hips or my abdomen, and I was in good health.' "

Plaintiff suffered severe pain for some time after the injury and was very nervous at the time of the trial. At the time of his injury he was seventeen years of age and enjoying good health. His life

expectancy at the time of his injury was 44.19 years. At that time he was under contract with one Mr. Black, a race horse owner, by which he was to receive two hundred dollars per month for that year, and three hundred dollars per month for the next year. The evidence shows that he will never be able to follow the occupation of jockey or do any kind of manual labor. In view of the serious and permanent character of his injuries and his incapacity to earn a livelihood we do not think a verdict of $32,000 is excessive.

The judgment is reversed and cause remanded with directions to set aside the order granting a new trial, reinstate the verdict, overrule the motion for new trial and enter judgment on the verdict. All concur.