GEORGE C. KENNEDY v. C. J. PHILLIPS, Appellant.—5 S. W. (2d) 33.

Division Two, March 24, 1928.

574

*Jones, Hocker, Sullivan & Angert* for appellant.

576

*Foristel, Mudd, Blair & Habenicht* and *Harry S. Rooks* for respondent.

HENWOOD, C.—Kennedy sued Phillips, in the Circuit Court of the City of St. Louis, for damages arising out of personal injuries suffered by him on September 22, 1922, when he fell down an unguarded elevator shaft in Phillips' store building. The trial re-

sulted in a verdict and judgment for Kennedy in the sum of $8000, and the case is here on Phillips' appeal from that judgment.

The questions presented for our review do not involve the pleadings and, although the motion for a new trial asserts that the verdict is excessive, no contention is made here as to the extent of the injuries complained of, nor as to the amount of damages awarded therefor.

Three items of negligence are alleged in the petition, (1) the unguarded elevator shaft, (2) insufficient light, and (3) failure to warn as to the danger. The answer is a general denial, coupled with a plea of contributory negligence. The reply is a general denial of the affirmative allegations of the answer.

A careful examination of the record discloses that counsel for respondent have, with a few exceptions, fully summarized the evidence on both sides, in their brief. With some alterations and additions, we adopt it as a fair statement of the material facts. So amended, the statement is as follows:

"At the time in question, the defendant owned and occupied a three-story brick building in the city of St. Louis, with a frontage of sixty-seven feet on Seventh Street and a depth of 128 feet on Poplar Street. The building was divided into three sections of three stories each, but we are concerned with the middle section only in this case. The second floor of this middle section was a room, about twenty feet wide and one hundred and twenty feet long, running lengthwise in an east-and-west direction. The west end thereof was the front, and faced on Seventh Street, while the east end thereof abutted an alley at the rear of the building. There was a stairway that led from the first floor to this second-floor room. Near the southeast corner of this room was the elevator shaft into which plaintiff fell. It was located at a distance variously estimated as six, ten or fourteen feet, from the east wall of the building, and was against the south wall. This shaft was about six feet square and through it ran the hydraulic elevator, which extended from the basement of the building to the third floor. The east and west sides of this elevator shaft on the second floor were said by defendant to be boarded up with unpainted boards and in their natural color, except as darkened by time. The east wall was painted gray, and last painted several years before. The south side of the elevator shaft was against the south wall of the room. The north side of the shaft was the entrance to the elevator, and it was entirely open except that it was provided with a gate. There was evidence that this gate was a slat-covered framework, about five feet high, running up and down vertically in grooves at the side of the shaft. When down, or closed, the lower edge of the gate was about ten inches above the floor level. When normally raised and open, its lower edge was just about high enough

for a man to walk under it, or about six feet. It appears from defendant's evidence that this gate was of a type called semiautomatic, and that it did not automatically open, but always had to be opened by hand by raising the gate up. When raised up there was some sort of a dog or ratchet device, which would hold the gate open in its raised position, and when the elevator at the floor was moved it would release the dog or ratchet, thereby automatically causing the gate to drop. The weight caused the gate to drop with such force that rubber was put on the gate to keep it from making a noise when it dropped. According to defendant's evidence, movement of the elevator of not more than about two inches from the floor level would release the gate on the second floor and cause it to fall. There was no device thereon that would prevent the gate from being opened when the elevator was not at the particular floor, nor was there any device which kept the elevator from being operated even though a gate at one of the floors was open, except that, as above stated, when in proper working order, movement of the elevator would release the gate at the particular floor if that gate was open. The gate could be propped up in an open position, in which event, of course, operation of the elevator would not cause it to fall or drop into the closed position. This elevator was, according to defendant's testimony, a freight elevator used only by himself and his employees, and other persons were not permitted thereon.

"The north and south sides of this room, each 120 feet long, had no windows whatever therein. But, at the east and west ends of the room, there were windows, according to defendant's evidence. Although there was evidence that there were several electric light bulbs there for illumination on the second floor, it is not disputed that none of them were lighted or burning at the time plaintiff was injured, and that whatever illumination there was on the second floor came by natural light from the windows in the east and west walls of the room. The illumination in this room at the time of the injury was a disputed question of fact at the trial, plaintiff's evidence showing that only a faint light came in and it was pretty dark or dimly lighted, although some objects could be seen; while there was evidence on behalf of defendant to the effect that it was much lighter. Evidence on plaintiff's behalf, as to the weather, showed that it was a dark, clammy morning, and by the report of the United States Weather Bureau it was shown that a light fog prevailed on that morning from about five A. M. until about nine A. M., during which time plaintiff fell and was injured.

"In this building the defendant owned and conducted a general store, wherein he had on display and for sale to the general public every imaginable description of merchandise. It appears that defendant had an arrangement with about fourteen railroads in St.

Louis, whereby they delivered to defendant the salvage or unclaimed freight, which it was defendant's duty to put on display to the public in his store, and to sell to the general public. According to defendant, these goods were still owned by the particular railroad while they were in defendant's possession for sale, and defendant received a commission for handling, displaying and selling the same. Defendant's contract with the Missouri Pacific Railroad (by whom plaintiff was employed) was introduced in evidence. In connection with this business, defendant had on display almost every kind of merchandise, described in the evidence as anything from 'automobiles to toothpicks,' from a 'needle to an automobile,' a 'great variety,' 'everything conceivable,' including farm implements of all kinds, and as many as eleven automobiles had been delivered to defendant at said store for sale at one time. The whole place was piled up with all kinds of goods, all around in the whole building, and in the second-floor room the goods were piled around up five or six feet high, and there was evidence that goods were piled in this manner at the east wall of this room. Even defendant's witness and employee, Cloos, admitted that there was a lot of stuff, including a few cartons, four feet high, and perhaps a drum of oil, piled around near the elevator shaft, although he said that an aisle there was left open and no goods were piled in front of the windows.

"In addition to the above testimony, affecting the amount of natural light that could come in from the windows, there was evidence that a railroad ran at the side of the building along Poplar Street, and defendant admitted that his windows were not washed oftener than about every sixty days.

"Defendant's store had an ordinary glass front, like any other store, an average store-front with double doors, and the general public were invited to come there and look over his stock and purchase, if they desired, like any other store. Under defendant's contract with the railroads, however, he was not permitted to sell the salvage railroad goods to railroad employees, subject, however, to the express exception, stated in the contract, that a railroad employee could purchase, if consent of the proper railroad official was obtained. Otherwise, defendant could and did sell to anyone, and did a general retail business, and the evidence showed that no particular alertness was maintained by defendant's salesman to prevent selling to railroad employees.

"Defendant testified that under his agreement with the Missouri Pacific Railroad, that railroad kept a man in his store all the time, opening boxes, checking and examining freight, and listing it up before turning it over to defendant, and that one Matheny (further referred to hereinafter) was the railroad's delivery clerk who delivered goods to defendant and was in and out defendant's store all

day long. He also testified that under the agreement he was obliged to let the Missouri Pacific employees in his store any time to inspect freight or accounts and that the special officers came over to inspect the goods, etc.

"At the time of plaintiff's injury, and also on the day preceding the injury, the defendant was not in the city of St. Louis, but was in Cleveland, Ohio. During the absence of defendant from the store, a salesman named Cloos was in charge thereof. Cloos was provided with a key for opening up the store in the morning, and was always the first one there and always opened it for business.

"On the opposite side of Seventh Street from defendant's store, there was a building in the middle of the block, wherein the Missouri Pacific Railroad maintained various offices, having therein numerous railroad employees. On a lower floor of this building was the office of the Missouri Pacific Railroad's special agent, who had charge of that railroad's private police in St. Louis. Plaintiff was employed by the railroad in that office as a clerk. The special agent in charge was J. H. Baer, and his assistant was defendant's witness Fitzgerald. When plaintiff came to work that morning, about 7:30, Baer and Fitzgerald were in the office. A few minutes later, Captain Doyle, then a police lieutenant of St. Louis, came to the office. The occasion for him visiting the office of the Missouri Pacific's special agent that morning was as follows: Some time prior to that date, an employee of another railroad had communicated with Fitzgerald and told him that Captain Doyle wanted to buy a kitchen sink, from salvage of one of the railroads, and Fitzgerald had communicated this fact to Matheny, so that when such a sink was delivered to defendant as salvage, Captain Doyle would be notified thereof in order that he might purchase it. It appears that on the day prior to the injury, Matheny had informed Fitzgerald that he had delivered such a sink as Doyle wanted to defendant, and this information had been forwarded to Captain Doyle, and in response thereto, Doyle called at Fitzgerald's office on the morning of the injury. His purpose was to purchase the sink.

"Defendant's salesman, Cloos, in charge of defendant's place of business, came to work that morning at about 7:30 o'clock, unlocked the front entrance door, and stood in front of the building on Seventh Street. Shortly after Cloos arrived, Matheny came to work and was talking to Cloos. After they were there a few minutes, Fitzgerald came across the street from the railroad office and told Matheny in Cloos's presence about Captain Doyle's visit there that morning and that he wanted to buy a sink. Fitzgerald and Matheny then, according to their testimony as defendant's witnesses, went into defendant's store and up the stairs to the second floor to find the sink which Matheny had reported. They looked about on the

second floor, but were unable to find it, and while up there, according to their testimony, both saw that the elevator gate there on the second floor was up as high as it would go, way up high, seven feet, and Fitzgerald, who had never been up there before, nearly fell into the elevator shaft before seeing it. Fitzgerald testified that he got within two or three feet of it before noticing it. Both testified that they remarked at the time that it was a 'nice place to step into,' and that Fitzgerald remarked 'that's a hell of a place; a good place for a fellow to get killed.' The elevator was not there at the second floor and left the hole of the elevator shaft open and unprotected. Fitzgerald and Matheny then, according to their testimony, returned to the first floor and to the front of the building, where Cloos was still outside smoking, and were then informed by Cloos that the sink had been sold the day before. Cloos told them that the sink was on the second floor near the elevator shaft, and Fitzgerald told Cloos then that he was going back to his office across the street and tell Captain Doyle to come over to defendant's store and look at the sink and if it was the right kind they would watch for the next one and let him know. Fitzgerald then went across the street to his office and there told Captain Doyle to come across the street to defendant's store. Plaintiff testified that both Doyle and Fitzgerald asked him to go along with them to the store, but both Doyle and Fitzgerald testified that they did not say anything to plaintiff about going with them. On cross-examination, plaintiff admitted that he didn't know anything about kitchen sinks and had no intention of buying one; also, that he went along just to be 'sociable' and just because he was asked to go along. He further admitted that he was not allowed to buy anything from defendant on account of being a railroad employee. 'Although Doyle had been told that the particular sink had been sold, he still wanted to purchase a sink, and wanted to look at this sink and see the dimensions and kind of sink that he wanted, so that when defendant had one on hand he could purchase it. Salesman Cloos testified that there were also other sinks up there, although not of the same kind as the one that was sold. When Fitzgerald, Doyle and plaintiff went across the street to defendant's store, Cloos and Matheny were out in front of the store, and the regular front-entrance doors were open. There was evidence that Fitzgerald there introduced Doyle to Matheny in Cloos's presence, and told him that Doyle was the man that wanted to buy the sink, and that Cloos told Matheny to take them up to see the sink, saying to Matheny, 'You know where it is.' In his testimony, Cloos admitted that he knew that Fitzgerald, Doyle and plaintiff were strangers up there on the second floor, and that he did not warn them of the elevator shaft. The evidence was conflicting as to whether or not Cloos told them the

store was not open for business until eight o'clock, but Cloos admitted that they told him they wanted to take Doyle up and show him the sink and that he, Cloos, said, 'All right.'

"Cloos apparently remained outside, and Matheny, plaintiff, Fitzgerald and Doyle then went in the open front entrance of defendant's store, then up the stairs to the second floor, then to the place where the sink was. Matheny found the sink, partially crated, where Cloos had directed them, but there was a crated bathtub standing on end next to it and up against it, which obscured the view, and goods piled about it, so that they could not see the sink 'without moving the tub. Thereupon they started to move the bathtub enough so that the sink could be seen. As they were doing this and letting the bathtub down, plaintiff took hold of the top end of it to assist in letting it down to the floor, and as plaintiff was letting it down he took a step backward, and thereby stepped into the open elevator shaft there and fell about twenty-five feet into the basement, sustaining the serious injuries sued for. It appears that the sink and bathtub were just a few feet north of the entrance to the elevator, but neither Captain Doyle nor plaintiff noticed the elevator shaft until plaintiff fell into it, although Captain Doyle was himself only about three feet away from it; the light was such that he could not see it. Plaintiff had never been up there before and did not know and was not warned that any elevator shaft was there. There was no railing or guard of any kind across the front of the shaft to prevent him falling, and he touched nothing there whatever at the time he fell. Plaintiff testified that he had not been up there then more than about three minutes and not long' enough to have an opportunity to observe in detail the conditions existing thereabout.

"After plaintiff fell, the other three men ran down the stairway and to the basement and got plaintiff out of the pit. None of them, according to their testimony, examined the elevator shaft or gate before running down to the basement. Salesman Cloos testified that he was out in front of the store at the time and heard a commotion inside and went in and saw that plaintiff had fallen into the basement; and Cloos went down to the basement, and 'then ran from the basement up the stairs to the second floor, and there, while alone, observed the conditions of the gate and elevator where plaintiff had just fallen. As to the conditions that he then found there, Cloos testified that the elevator and the lower edge of the elevator gate were three or four feet higher than the level of the second-floor, and that the elevator gate was raised up with its lower edge at a point about even with the floor of the elevator without anything to support it in that position. In other words, that both the floor of the elevator and the lower edge of the elevator gate, were about

three or four feet higher than the floor level of the second floor. He said he reached into the shaft and manipulated the control cable of the elevator, brought it to the level of the second floor, and that he raised the gate and got into it and took the elevator down to the basement, where plaintiff was put on it and taken to the second floor and from there removed to a hospital. Cloos testified that both the gate and the elevator worked all right at that time and all other times, and he had no explanation to offer as to how the elevator and gate could have gotten into the above position, or as to how the gate could be suspended in the position that he claimed to have found it.

"Defendant testified that he returned to St. Louis on the morning of the accident, and arrived at his store at about ten o'clock A. M. and was informed that the accident had occurred; that he thereupon telephoned to the city inspection office and requested an inspector to come and inspect his elevator, and that an inspector did come on the same day and inspected it. He testified that even though the elevator should creep (that is, move very slowly), nevertheless that it should and would release the gate and cause it to close, and that he knew this because on that same day, after the accident, the second-floor gate was tested in that respect, with the elevator creeping. He also testified that no repairs were made after the accident, and that no repairs had ever been made from that time up until the time of trial.

"There was no direct evidence as to who last operated the elevator on the previous day or where it was left when the store was closed. Cloos testified that he had operated the elevator on the previous day and operated it every day, but that he did not know who operated it last on the previous day, nor where it was left at the close of business. Cloos testified, however, that he had placed the sink and various other articles of merchandise in their position near the elevator shaft on the previous day. As to the elevator creeping, Cloos testified that he had never noticed it creep before that morning, but he did notice it creep that morning after the accident. He admitted, on cross-examination, that sometimes the pressure of the water would move it a little ways and that if the elevator was stopped and the water not entirely turned off, so that the power leaked a little bit, then it would creep; that the power could be turned off at night and prevent any creeping; that in freezing weather the power was always turned off at night; and that it was not turned off the night preceding plaintiff's injury.

"A city elevator inspector testified, on behalf of defendant, that he inspected the elevator on the day following the accident, and not on the day of the accident, and that he found nothing wrong with the elevator or the gate, and so reported. The evidence also showed that the elevator was last inspected prior to the injury on

July 25, 1922, the report being that the elevator was in good condition.

"During the above mentioned inspection made after the accident, defendant rode on the elevator and accompanied the inspector. Neither defendant nor the inspector offered any explanation as to how the injury occurred.

"Defendant further testified that, at the time in question, he had in his employ a maintenance man, named Emil Meyer, to look after his elevators, gates and doors. Meyer resigned his position at the store in the summer of 1924, to go on an extensive automobile trip, and was in Colorado when defendant last heard from him. He did not testify at the trial and his deposition was not taken."

I. Learned counsel dispute defendant's liability on the facts of this case, on four grounds: first, because plaintiff entered defendant's store as a mere licensee and not as an invitee; second, because, conceding that plaintiff entered the store as an invitee, he exceeded the limits of his invitation and had thereby become a licensee at the time of his injury; third, because the evidence fails to show any negligence on the part of the defendant in connection with the unguarded elevator shaft; fourth, because plaintiff was guilty of contributory negligence as a matter of law. We will discuss these questions in the order named.

(a) While much has been written on the general subject of the liability of storekeepers and other proprietors for injuries received by licensees and invitees, the well-established rule in this and other jurisdictions is very plainly stated and very clearly explained by Judge Lamm in the leading case of Glaser v. Rothschild, 221 Mo. 180, 184, 120 S. W. 1, 2. The rule is stated and explained by Judge Lamm, as follows:

"In such cases as this the root of the thing, the deciding question, is: Do the facts raise a duty, a breach of which is shown? [Pierce v. Whitcomb, 48 Vt. 127; Sweeny v. Old Colony R. R., 10 Allen, 368.] There are such sure and clear words in the law in that behalf that all doubts are resolved and one who runs may read. The general rule is that the owner or occupier of premises lies under no duty to protect those from injury who go upon the premises as volunteers or merely with his express or tacit permission from motives of curiosity or private convenience in no way connected with business or other relations with the owner or occupier. [Hargreaves v. Deacon, 25 Mich. 5; Benson v. Baltimore Traction Co., 77 Md. 535; Railroad v. Slaughter, 167 Ind. 330, and cases cited; see also arguendo, O'Brien v. Steel Co., 100 Mo. 182, and Glaser v. Rothschild, 106 Mo. App. 418; Kelly v. Benas, 217 Mo. 1.]

"A bare licensee (barring wantonness or some form of intentional wrong or active negligence by the owner or occupier) takes the

premises as he finds them. . . . Mere permission without more involves leave and license, but bestows no right to care. If A give B leave to hunt mushrooms for his table in A's field, and B fall into a ditch, or uncovered pit, and is harmed, no duty was raised, no breach is made and, hence, no action lies. As put by way of illustration in the books, suppose A owns a sea-view, a cliff, and gives B permission to walk on the edge of the cliff for pleasure or air, it would be absurd to contend that such leave cast on A the burden of fencing the cliff to keep B from falling off.

"But the situation with reference to liability radically changes *when the owner invites the use of his premises for purposes connected with his own benefit, pleasure and convenience.* That change calls into play other rules of law in order to do full and refined justice. The rule applicable to that change is that a licensee who goes upon the premises of another *by that other's invitation and for that other's purposes is no longer a bare licensee. He becomes an invitee and the duty to take ordinary care to prevent his injury is 'at once raised and for the breach of that duty an action lies.* [See authorities, supra; Pauckner v. Wakem, 231 Ill. 276; and a line of cases cited by GILLET, J., in the Slaughter case, supra; also, Nephler v. Woodward, 200 Mo. 179, *arguendo.*]

"The word 'invitation' used in the rule covers and includes in it enticement, allurement and inducement if the case in judgment holds such features. Also, the invitation may be implied by a dedication, or it may arise from known customary use. [Drennan v. Grady, 167 Mass. 415; and cases, supra.] *So, too, it is held in all the cases that the invitation may be implied by any state of facts upon which it naturally and reasonably arises.*" (Italics ours.)

It must be conceded that Doyle was an invitee in defendant's store. While he knew that the particular kitchen sink he was invited to look at was sold, it is perfectly clear that he was in the market for a kitchen sink and wanted to buy one from the defendant, if defendant had one that suited him, either on the day in question or on some later day. His fixed purpose to purchase a kitchen sink was his sole reason for going to defendant's store. In our opinion, the status of Doyle on this occasion, if not controlling, sheds much light on the status of plaintiff. True, plaintiff said that he knew nothing about kitchen sinks and had no intention of buying one, at that time, and that he went with Doyle to be "sociable," but it is also true that he went with Doyle, so he testified, because both Doyle and Fitzgerald, his superior officer, asked him to go. Doyle was a customer and, obviously, thought it was to his advantage to buy the article desired at defendant's store. With Doyle's mission fully explained to defendant's salesman, in charge of the store, Doyle and plaintiff, as well as Matheny and Fitzgerald, were *express-*

*ly invited* to go to the second floor of the store and inspect the kitchen sink. If it is reasonable to assume, and we think it is, that in the buying and selling of goods there is a mutual advantage and benefit to both buyer and seller, then the *business in hand,* that is, the inspection of the kitchen sink, was of mutual advantage and benefit to the customer, Doyle, and to the storekeeper, defendant. That plaintiff was there to assist Doyle in the inspection of the kitchen sink, and, thereby, to assist defendant in the sale of a kitchen sink cannot be disputed. And defendant's salesman knew that plaintiff was there for that purpose. Moreover, this was a public store, where goods of all kinds were kept on display and for sale to the general public, and where defendant *impliedly invited* the general public to come and look over his wares, in the hope of a sale. Had plaintiff escaped the unguarded elevator shaft, he might have become interested in a salvaged automobile or some other attractive article of merchandise, at a reduced price, and bought such article, after first obtaining permission to do so from his employer. It is our conclusion, therefore, that under the facts referred to and the rule of law above stated, plaintiff was not only *constructively an invitee* but was *actually invited* into defendant's store.

In the case of Welch v. McAllister, 15 Mo. App. 492, 496, the evidence showed that plaintiff accompanied her husband into defendant's pork house, where her husband asked the foreman for a smoked shoulder. The foreman said he had no smoked shoulder, but did have some salted shoulders, pointing to the same in the back part of the storeroom. The foreman and plaintiff's husband started to the back part of the room to look at the salted shoulders and the plaintiff, following at some distance behind, fell into a hatchway and was injured. It was held that she could recover, though she was not invited, requested or commanded by her husband, the defendant's foreman, or any other person, to go into defendant's pork house on that occasion. Among other things, Judge THOMPSON, speaking for the court, said: "The general rule that an owner or occupier of enclosed premises owes no duty to trespassers, volunteers, or bare licensees, to keep them in a safe condition so as to prevent injury to persons thus coming upon them, is conceded. This rule has, however, no application in respect to injuries which happen in consequence of dangerous places being left in business houses, into which the public are impliedly invited by the proprietor or tenant to trade or do business with him." This case, also, has become a leading case and is often cited by the appellate courts of this and other states. In this connection, see, also, Geninazza v. Storage Co., 252 S. W. (Mo. Sup.) 417; Main v. Lehman, 294 Mo. 579, 243 S. W. 91; Applegate v. Railroad, 252 Mo. 173, 158 S. W. 376: Crawford v. Stock Yards Co., 215 Mo. 394; 114 S. W. 1057;

Hollis v. Merchants' Association, 205 Mo. 508, 103 S. W. 32; Scott v. Kline's, Inc., 284 S. W. (Mo. App.) 831; McCullen v. Amusement Co., 198 Mo. App. 130, 199 S. W. 439; Woods v. Ry. Co., 192 Mo. App. 165, 179 S. W. 727; Martin v. Motor Vehicle Co., 158 Mo. App. 188, 138 S. W. 65; Kean v. Schoening, 103 Mo. App. 77, 77 S. W. 335; Warner v. Lucey, 201 N. Y. Supp. 658, 238 N. Y. 638. On this proposition, the cases cited by counsel for appellant are, in the main, cases decided in other jurisdictions. However, it should be noted that all of them are readily distinguishable on the facts, excepting two. In these two cases Petree v. Davidson Co., 118 S. E. (Ga. App.) 698, and Fleckenstein v. Tea Co., L. R. A. 1918C (N. J.), 180, the rules announced are out of accord with the rulings of this court and with the greater weight of authority.

(b) In view of the plain, outstanding facts of this case, it is apparent at once that plaintiff did nothing, after entering defendant's store, in excess of his rights as an invitee. On the other hand, at the very moment of his injury, he was engaged in doing the very thing *he had actually been invited to do* by defendant's salesman. The salesman admitted that, on the previous day, he placed the kitchen sink and other articles near the elevator shaft, in preparation for their removal from the second floor by the elevator and their delivery to the purchasers thereof. He knew that Doyle wanted to inspect the kitchen sink closely and that he could not do so with other articles piled against it and around it. And while assisting Doyle, Matheny and Fitzgerald in moving the crated bathtub from its leaning position against the partially crated kitchen sink, in order that Doyle might examine the kitchen sink, plaintiff took one step backward and fell into the unguarded elevator shaft and thereby met his injury. Again, the language of Judge LAMM in Glaser v. Rothschild, supra, is pertinent: "In getting at the essence of and giving reasonable scope to the rules of law applicable to the liability of the owner for injuries received by an invitee, it has been well held that his license does not give him the right to roam at will, without further invitation, to out-of-the-way places on the premises, *wholly disconnected from and in no way pertaining to the business in hand;* . . . The colloquy between plaintiff and defendant, the things that led up to it and produced it, being all usual incidents of a visit and a wait for defendant's good, it follows that the visit to the store, the wait and the visit to the water closet are elements of a single and inseparable transaction, colored by a common and dominant purpose, and such being the case, the law steps in and puts its reasonable construction on what happened in the light of the civilities of civilized life." Thus, it was held in that case, that plaintiff's visit to the water closet in defendant's store, while waiting to talk business to defendant at defendant's

request, did not change plaintiff's status as an invitee, nor defeat his claim for damages for injuries resulting from his fall into an open elevator shaft in defendant's store. With reference to this question also, appellant's counsel rely on cases in which the plaintiff, when injured, was using the premises of another person, either without any invitation, express or implied, or in excess of the reasonable scope of the invitation extended. Such cases, of course, have no application here.

(c) The facts proven and reasonable inferences to be drawn therefrom made a clear case for the jury on the negligence charged. The elevator shaft was open and unguarded. Defendant's salesman knew that plaintiff was going near the elevator to look at the kitchen sink and that plaintiff was a stranger on the second floor. He did not warn the plaintiff as to the danger. The light was not sufficient to enable plaintiff to see and appreciate the danger. The elevator was used only by defendant and his employees. As to who left the gate open or who moved the elevator the record is silent. Confronting this situation, we are guided by the pointed language of Judge VALLIANT in the case of Crawford v. Stock Yards Co., supra: "There was no express evidence as to who left the gate open. But if the gate was open as and when the plaintiff says it was, was it an unwarranted inference that it was left open by defendant or some of its employees? If the gate was open and plaintiff was hurt by it, did it devolve on him to prove who opened it? If so, then, in a case like this, there would be no remedy for the injury. The gate was in the keeping of the defendant and if it was left in a negligent manner and no testimony showing who did it the inference would naturally be that the keeper did it." Likewise appropriate, is the following: "The true ground of liability is the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property. It is when the perilous instrumentality is known to the owner or occupant and not known to the person injured that a recovery is permitted." [20 R. C. L. 57, par. 52.] It might also be reasonably inferred that the elevator slowly crept away from the second floor in the nighttime and left the gate open because it was propped or because the ratchet device did not work and cause it to drop. Defendant's salesman knew that the water pressure "sometimes" moved the elevator "a little ways." Knowing this, ordinary care required that he turn the water off at night for the reasonable safety of customers and other invitees on the premises on the following day.

(d) The contention that plaintiff was guilty of such contributory negligence as to bar his recovery cannot be seriously considered. The only possible negligence, if any, chargeable to the plaintiff was his failure to see and avoid the open and unguarded elevator shaft, the mouth of the trap in which he was

caught. The existence of the trap was unknown to him and he was not warned concerning it. As an invitee, he had a right to assume that defendant's premises were reasonably safe; especially that part of the premises to which he had been invited to go, and without any warning as to any danger. His ability to discover and avoid the danger involves the question of sufficient light only. The electric lights were not burning. The only natural light came through windows in each end of the room, which was 120 feet long. Goods were piled five or six feet high about the room and in the vicinity of the elevator shaft. It was a "dark, clammy morning" and a "light fog prevailed" at the time. Doyle, who was standing near plaintiff, did not see the elevator shaft until plaintiff fell into it. Defendant's contradictory evidence on this question merely presented an issue for the jury and the jury was fully warranted in finding that plaintiff's fall into the elevator shaft was caused by his inability to see the same and not by any negligence on his part. "Where, however, the danger is not so obvious that a person should have seen it in the exercise of ordinary care, failure to discover it is not negligence." [Geninazza v. Storage Co., supra, 1. c. 419.]

In keeping with the foregoing conclusions, we rule that the demurrers to the evidence were properly overruled.

II. Counsel for defendant further contend, with great earnestness, that the trial court erred in giving plaintiff's Instructions numbered 1, 4 and 5, and in refusing defendant's Instructions C, D and E. We have examined these instructions with great care and find that no error was committed in giving plaintiff's Instructions 1 and 4, nor in the refusal of defendant's Instructions C, D and E. Our conclusion is different, however, as to plaintiff's Instruction 5. This instruction reads as follows:

"The court instructs the jury that if you find and believe from the evidence that the defendant had in his store an elevator shaft in which an elevator ascended and descended, and that the entrance to the elevator at the second floor was provided with a gate which did not open automatically, but could be opened only by hand, and that said elevator and gates were in the exclusive use and control of the defendant and his employees and was not a passenger elevator or open to and suffered to be operated by customers, but was used only by defendant's employees; and then if you further find that on the morning when plaintiff fell into the shaft and was injured (if he did so), and when the store was opened in the morning the gate to the elevator shaft at the second floor was found to be open, or up, *then you are at liberty to infer that said elevator gate had been opened and left open by employees of the defendant.*" (Italics ours.)

Although the jury was warranted in inferring, from the facts mentioned in this instruction and other facts in the case, that one of defendant's employees opened the elevator gate and left it open, as we have already said in discussing the sufficiency of the evidence, nevertheless, it was not the province of the trial court to tell the jury that they were "at liberty" to draw this or any other inference from the facts proven. This instruction singled out certain facts and commented on their legal effect. It was argumentative in character. It might have been accepted by the jury as decisive of the case. It was better calculated to mislead and confuse the jury than to enlighten them in their consideration of the whole case. It invaded the province of the jury in suggesting to them a course of reasoning to follow in determining the question of defendant's negligence. [Finn v. United Rys. Co., 267 S. W. (Mo. Sup.) 416, 420; Rice v. Transit Co., 216 S. W. (Mo. Sup.) 746, 753.] In the early case of Chouquette v. Barada, 28 Mo. 491, 498, 499, Judge Scott said: "When a party has secured the admission of his evidence, he has no right to give it an undue importance by an instruction to the jury as to the use they may make of it. Counsel can make their own comments on the evidence, and the jury will determine their weight. . . . Where the law fixes the weight or the effect of evidence, there is no impropriety in the court's declaring it to the jury; but when one fact or piece of evidence is merely used to show the existence of another fact which is to be found by the jury, the court cannot, by way of instruction, direct the jury that the inference is warranted. If it is so, the law presumes the jurors more competent to draw it than the judge. Our law will not allow the judge even to comment on the evidence, where the jury may give what weight they please to the comment." [See, also, Gittings v. Jeffords, 292 Mo. 678, 693, 694, 239 S. W. 84, 89; Supply Co. v. Wolfe, 127 Mo. 616, 626, 30 S. W. 145, 148; Primm v. Haren, 27 Mo. 205, 211.] Considering the persuasive influence of the court's instructions with the average jury, this instruction was manifestly unfair to the defendant and highly prejudicial to his right to have the jury properly instructed and directed on the law of the case. It follows that the giving of this instruction was reversible error.

Because of the error of the trial court in giving this instruction, the judgment is reversed and the cause remanded for another trial. *Higbee* and *Davis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.