Sarah MILLER (Plaintiff), Appellant,

v.

Joseph CRACCHIOLA and Beulah Cracchiola (Defendants), Respondents.

No. 30113.

St. Louis Court of Appeals. Missouri.

Feb. 17, 1959.

Rexford H. Caruthers, Martin Schiff, Jr., Husch, Eppenberger, Donohue, Elson & Jones, and Jack H. Ross, St. Louis, Mo., for appellant.

Wilburn A. Duncan, Spencer & Duncan and Sidney M. Glazer, St. Louis, for respondents.

DOERNER, Commissioner.

This is an action brought by Mrs. Sarah Miller in the Circuit Court of the City of St. Louis against her son-in-law and daughter, Joseph Cracchiola and Beulah

Cracchiola, to recover damages in the sum of $10,000 for personal injuries and expenses resulting from a fall at the home of the defendants. A jury trial resulted in a verdict and judgment of $4,000 in favor of plaintiff and against both defendants. Subsequently the trial court overruled the defendants' motion for a new trial but sustained their motion to set aside the verdict and to enter judgment in their favor, from which action the plaintiff appealed.

The defendants' residence is known and numbered as 4908 Bulwer Avenue, in the City of St. Louis. It is situated on the east side of Bulwer, which runs in a north and south direction, and therefore faces west. A public sidewalk is constructed along the front of the property. The building is situated back or east of the sidewalk a distance, judging from the photographs in evidence, of about twenty feet, and the front yard is bounded by a fence, set back about three feet from the public sidewalk. Between the public sidewalk and a gate in the fence there is a short concrete walk, about three feet long, and then two concrete steps, the tread of the higher being on the same level as the concrete walk in the front yard, which walk leads up to the front steps of defendants' residence.

The fence, which runs along the south, west and north sides of the front yard, is built of 4 x 4″ posts, set about seven or eight feet apart, with 2 x 4 stringers between the top and bottom of the posts. Woven wire fencing is stretched along and fastened to this wooden framework. A gate is located in the front fence, at the southwest corner of the yard, and hangs over the tread of the lower of the concrete steps. This gate is composed of a tubular metal framework, with wire fencing stretched over it. The south side of the gate is hinged on the most westerly post of the south fence. A spring latch, made out of a strip of metal, is attached to the northern side of the gate, the lower end being bolted to the tubular frame and the upper end, because of a bend, standing away from the

frame about an inch or more. The latch is designed to fit into a horseshoe-shaped socket fastened onto the wooden post adjacent to the north side of the gate, and is so fashioned that in order to release the latch from the socket, assuming it to be properly seated therein, it is necessary to spring or bend the latch towards the gate, or southwardly. Ordinarily gates of this kind, when unlatched, may be swung inwardly or outwardly, but because of being hung across the tread of the lower concrete step this particular gate could only be opened outwardly, or towards the public sidewalk.

At the telephoned request of Mrs. Cracchiola, her daughter, who desired to go to the doctor, plaintiff went to the defendants' home on the day of the accident to baby-sit with defendants' three year old daughter, Patricia. She arrived at the defendants' home between 11:00 a. m. and 11:30 a. m. Plaintiff and her husband, who had accompanied her, were sitting on the front steps of the residence when Mrs. Cracchiola departed, through the front gate. About 11:45 a. m. plaintiff noticed that Patricia had climbed upon the top 2 x 4 of the fence at the southwest corner of the yard, about nine or ten inches from the gate, and when the child failed to obey her admonition to get down, plaintiff went to take her off of the fence.

Plaintiff stated that as she lifted Patricia off of the fence she was facing west or southwest. She turned to her left to set the child down on the ground. As she did so she stooped over and leaned slightly against the gate, with her hip or buttock. The gate opened, and she fell on to the sidewalk, breaking the femur in her left leg just below the ball of the bone. As a result, an operation was required so that the fractured bone might be aligned and secured by a pin, nail, and subtrochanteric plate, but plaintiff was left with permanent injuries.

On cross-examination plaintiff testified that she and her husband (who had passed away before the case was tried) lived about

three city blocks away from their daughter at the time of the accident; and that during the nine years preceding the occurrence she had visited her daughter on an average of three times a week, always entering and leaving by the front gate, so that in going in and out over the years she had used it approximately 2,700 times. She admitted to being familiar with the manner in which the spring latch operated, but stated that she had never paid any particular attention to its condition. The weather on the day of the accident was sunshiny, clear and dry.

On redirect-examination plaintiff stated that before the accident she had done most of her housework, but was unable to do so afterwards; and that prior to the accident " * * * at times she (Mrs. Cracchiola) took my laundry and done my laundry for me, and I baby-sit for her."

Plaintiff contends that her status upon the defendants' premises was that of an invitee, as distinguished from that of a mere licensee. She argues that the purpose for which an entrant goes upon the owner's or occupant's land determines his legal status. Wolfson v. Chelist, Mo.App., 278 S.W.2d 39, affirmed Mo.Sup., 284 S.W.2d 447; Porchey v. Kelling, 353 Mo. 1034, 185 S.W.2d 820; Stevenson v. Kansas City Southern R. Co., 348 Mo. 1216, 159 S.W. 2d 260. And that since she had gone to the defendants' home at the express request of Mrs. Cracchiola, for the sole purpose of baby-sitting with the defendants' daughter, an economic benefit was thereby conferred upon the defendants, by which plaintiff acquired the legal position of a business invitee. Oliver v. Oakwood Country Club, Mo.Sup., 245 S.W.2d 37; Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S.W.2d 119; Gilliland v. Bondurant, Mo. App., 51 S.W.2d 559, affirmed 332 Mo. 881, 59 S.W.2d 679; Kennedy v. Phillips, 319 Mo. 573, 5 S.W.2d 33; Glaser v. Rothschild, 221 Mo. 180, 120 S.W. 1, 22 L.R.A., N.S., 1045. Defendants contend, on the other hand, that plaintiff was a gratuitous licensee; that she did not go to the de-

fendants' home for any purpose connected with defendants' business, or plaintiff's own business; that there was no intention on the part of either party to pay plaintiff for her services or to make her a domestic servant; that essentially the purpose was a family visit, in view of the family relationship with Mrs Cracchiola and plaintiff's granddaughter; and that plaintiff's status was therefore that of a social guest. Wolfson v. Chelist, supra. The point is material in that it is determinative of the duty owed by the defendants to the plaintiff. If plaintiff was an invitee, as that term is used in the legal sense, then it was the duty of defendants to use ordinary care to prevent injury to her. On the other hand, if plaintiff was a mere licensee she took the premises as she found them, and barring wrong or active negligence on the part of defendants, of which the record is devoid, she cannot recover from the defendants for her injuries. Wolfson v. Chelist, supra; Glaser v. Rothschild, supra.

It may be observed, in passing, that there is no case in Missouri in which the entrant was a baby-sitter. In fact, the only such case cited, and we found no other, is Fahey v. Sayer, 48 Del. (9 Terry) 457, 106 A.2d 513, 49 A.L.R.2d 353. There the plaintiff was not a member of the defendant's family, and monetary compensation was to be paid for her services. That court held that plaintiff was a business visitor and hence an invitee, but denied recovery on the grounds that plaintiff had exceeded the scope of her invitation. A more analagous factual situation existed in Laube v. Stevenson, 137 Conn. 469, 78 A.2d 693, 25 A.L.R.2d 592, where a mother, visiting her daughter and son-in-law in their home, pursuant to a standing invitation, who assisted her daughter with the household duties and the care of the latter's baby, was held to be a gratuitous licensee. Subsequently the same court held, in Lubenow v. Cook, 137 Conn. 611, 79 A.2d 826, that a mother who was aiding her daughter and son-in-law in moving from the plaintiff's home to that of the

defendant's, the son-in-law's mother, was a social guest or licensee while on the defendant's premises. In Colbert v. Ricker, 314 Mass. 138, 49 N.E.2d 459, 147 A.L.R. 647, the defendant, the owner of her own home, invited her mother to visit her for the purpose of conferring with the defendant's husband, a contractor, regarding certain repairs on the mother's home. It was the conclusion of that court that as to the daughter, who had no financial interest in her husband's business, the mother was a social guest. And the same result was reached in Mitchell v. Legarsky, 95 N.H. 214, 60 A.2d 136, where plaintiff was injured while at the home of the defendant, her sister-in-law, where she had gone at defendant's express invitation, to assist the defendant with her sewing.

The tenor of these cases indicate that where, as here, there is a close family relationship between the visitor and the owner or occupant of a home, persuasive evidence of a true business relationship is required to establish the status of the visitor as that of business invitee. However, because of the conclusion we have reached on the issue of negligence, for the purpose of this opinion we will assume, without deciding, that plaintiff was an invitee.

■ The only charge of negligence made in plaintiff's petition was that " * * * the latch on said gate was defective and would not hold said gate secure when closed, and that said defective condition was allowed and permitted to exist by defendants when they knew, or in the exercise of ordinary care should have known, that it did so exist, in time thereafter to have repaired said defective condition or to have warned plaintiff of its existence, and to have thus and thereby avoided plaintiff's said fall and injury, but defendants failed to do so." In order to make a submissible case under this allegation it was incumbent upon the plaintiff to prove, among other essentials, that the latch was defective and would not hold the gate securely closed when leaned upon; that the defendants had knowledge that

the latch was defective; and that defendants should have anticipated that plaintiff would lean upon the gate and either have repaired the latch or have warned her of its dangerous condition. The authorities are uniform in holding, as the basis of a defendant-proprietor's liability, his superior knowledge of an unreasonable risk of harm of which the invitee does not or in the exercise of ordinary care should not know. Bowyer v. Te-Co., Inc., Mo.Sup., 310 S.W. 2d 892; Stafford v. Fred Wolferman, Inc., Mo.Sup., 307 S.W.2d 468; Dixon v. General Grocery Co., Mo.Sup., 293 S.W.2d 415.

■ Even though viewed in a light most favorable to the plaintiff, the evidence fell far short of supporting plaintiff's charge of negligence. There was no testimony that the latch did not seat properly in the socket; that the latch or the socket was worn; that the latch or the socket was loose; that the latch did not function normally in the manner it was designed to operate, or that the latch was defective in any respect. Plaintiff's own evidence, gained through the hundreds of times she had used the gate over a period of nine years, was that the latch functioned normally and that so far as she knew, the gate had never come open before.

As part of her case, plaintiff introduced in evidence a part of the deposition of her daughter, Mrs. Cracchiola. It is this testimony, she claims, which supports her charge that the latch mechanism was defective. Because of its importance we quote in its entirety the excerpt from the deposition:

"Q. Have you ever had occasion at any time since you bought the property to see anybody open that gate or to see it open by itself without the latch being pulled? A. Is it all right if I answer that?

"Mr. Duncan: Yes.

"The Witness: Yeah. Like I said, when the wood is dry *before it was fixed* it could, you could lean on the

one side and it could fly open. (Emphasis ours.)

"Q. Which side? A. I am not good at directions. On this side here (indicating), this post here, and it would. fly open at that time.

"Q. If you leaned against this post that holds up the gate to which the gate is connected, which is at the south edge of the gate— A. You don't have to lean on this post. I said you lean on this two-by-four, not this post that the gate is onto, no.

"Q. You are referring to the two-by-four which is the upper rail, so to speak, of the south fence? A. Yeah, especially if it wasn't caught good.

"Q. That would cause it to come open? A. Yes.

"Q. When is the first time you ever noticed that occurring, how long after you moved in? A. Oh, I can't say exactly because I don't remember exactly.

"Q. Would it have been sometime prior to 1956? A. Oh, yes, it could have happened.

"Q. You have seen that occur prior to 1956? A. Not often, just maybe once or twice."

It is obvious that in testifying as to the one or two instances when the gate came open Mrs. Cracchiola was referring to occasions prior to the time when repairs had been made to the fence. There was nothing in her testimony to indicate that the gate ever came open after the fence was repaired. Furthermore, there is a total absence as to any defect, whether of wear, improper operation, or otherwise so far as the latch mechanism is concerned. Note, in that connection, her comment that the gate came open "especially if it (the latch) wasn't caught good" when someone leaned on the upper two-by-four of the south fence—not on the gate. The only conclusion which can be drawn from the whole of her testimony is that when a force or weight was exerted against the south fence the post on which the gate was hinged (the most westerly post in the south fence) would be pushed southwardly, thereby causing the latch to be pulled out of its socket and the gate to swing open. That evidence, in our opinion, fell far short of sustaining plaintiff's charge that the latch was defective, or that the defendants had noticed that the latch would open when someone leaned against the gate, because of a defect in the latch.

Nor can we agree with plaintiff's contention that the defendants were under a duty to anticipate that anyone would lean against the gate for support. Plaintiff cites Herdt v. Koenig, 137 Mo.App. 589, 119 S.W. 56; McGinley v. Alliance Trust Co., 168 Mo. 257, 66 S.W. 153, 56 L.R.A. 334; and Devens v. Goldberg, 33 Cal.2d 173, 199 P.2d 943, in support of her argument on that score. The Herdt case involved a wooden fence; the McGinley case a railing or balustrade of a stairway; and the Devens case a porch railing. Those cases hold, as stated in the Herdt case (137 Mo.App. at page 597, 119 S.W. at page 59), that "it is a matter of common knowledge that ordinarily prudent persons lean upon fences, bridge rails and stair banisters without taking thought of injury." But those cases are not applicable here. Fences, bridge-rails, banisters and porch railings are fixed and stationary objects, upon which one may logically expect to lean. Not so with a gate. While it completes, when closed, the enclosure formed by the fence, its primary purpose is to furnish a ready means of ingress and egress. It is designed and intended to move and to swing, in one direction or the other, and frequently in both. Hence the ordinarily prudent man should not expect to lean upon a gate with impunity, nor should an ordinarily prudent owner of premises be required to anticipate that he will do so.

For the reasons stated it is the recommendation of the Commissioner that the judgment of the trial court be affirmed.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

Accordingly, the judgment of the trial court is hereby affirmed.

RUDDY, P. J., WOLFE, J., and JOHN K. REGAN, Special Judge, concur.